2019 IL App (1st) 180835

No. 1-18-0835

Opinion filed August 14, 2019

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| SUSAN R. GRAUER and THOMAS M. TRENDEL, as Independent Coexecutors of the Estate of Dolores Trendel, Deceased,<br><br>   Plaintiffs-Appellees,<br><br> v.<br><br>CLARE OAKS, an Illinois Not-For-Profit Corporation d/b/a Assisi at Clare Oaks and/or Assisi Healthcare Center at Clare Oaks; CRSA/LCS MANAGEMENT, LLC, an Iowa Limited Liability Company; CRSA/LCS EMPLOYMENT SERVICES, LLC, an Iowa Limited Liability Company; PERCIVAL BIGOL, M.D.; PERCIVAL A. BIGOL, M.D., LTD.; and MICHELLE HART-CARLSON,<br><br>   Defendants<br><br>(CLARE OAKS,<br><br>   Defendant-Appellant). | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Appeal from the<br>Circuit Court of<br>Cook County<br><br>No. 13 L 2472<br><br>The Honorable<br>Thomas V. Lyons, II,<br>Judge Presiding. |

   PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
   Justices Howse and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1   The defendant-appellant, Clare Oaks, an Illinois not-for-profit corporation doing business

as Assisi at Clare Oaks and Assisi Healthcare Center at Clare Oaks (Clare Oaks), appeals to this court following a jury verdict against it and in favor of the plaintiffs-appellees, Susan R. Grauer and Thomas M. Trendel, as independent coexecutors of the estate of Dolores Trendel, deceased, in the circuit court of Cook County, on claims alleging violations of the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2016)), common-law negligence, and wrongful death. The plaintiffs' claims arose out of injuries that they allege Dolores Trendel (Trendel) sustained when she suffered a stroke on March 30, 2011, two weeks after she stopped receiving Coumadin, a medication that reduces the risk of stroke in individuals with atrial fibrillation. Trendel died on March 15, 2015, and the plaintiffs allege that her death was due to complications from the stroke. Clare Oaks was the licensee licensed by the Department of Public Health to operate the facility at which Trendel was a resident at the time of the occurrence.

¶ 2        The plaintiffs' claims against Clare Oaks were tried to a jury along with their claims against several other defendants who are not parties to this appeal. One such defendant, Michelle Hart-Carlson, was the administrator of Clare Oaks. The jury found in favor of Hart-Carlson and against the plaintiffs on the claims against her. Other such defendants were Percival Bigol, M.D., and his medical practice group, Percival A. Bigol, M.D., Ltd. (collectively Dr. Bigol). Dr. Bigol was the medical director of Clare Oaks and Trendel's attending physician while she was a resident there. The plaintiffs brought claims against Dr. Bigol in both capacities, but the jury found in favor of Dr. Bigol and against the plaintiffs on all claims against him.[1]

¶ 3        Following the jury verdict, the trial court denied Clare Oaks' posttrial motion for a new trial. The trial court also granted a motion by the plaintiffs that Clare Oaks pay their attorney fees

---

[1]The plaintiffs put on no evidence concerning defendants CRSA/LCS Management, LLC, and CRSA/LCS Employment Services, LLC. These defendants remained in the case through the close of evidence, at which point the trial court granted directed verdicts in their favor without objection.

and costs pursuant to section 3-602 of the Nursing Home Care Act (*id.* § 3-602). Clare Oaks argues on appeal that a new trial should be ordered based on a number of erroneous rulings by the trial court during the trial, as well as because of certain remarks by the attorneys and witnesses for the plaintiffs. Clare Oaks also appeals the order awarding attorney fees and costs. For the following reasons, we affirm in part and reverse in part.

¶ 4                                           I. BACKGROUND

¶ 5        On February 23, 2011, Trendel was admitted to Clare Oaks for rehabilitation after she fractured her ankle. Then 85 years of age, she also suffered from atrial fibrillation, a heart condition that put her at risk for developing blood clots that, in turn, increased her risk of stroke. To reduce this risk, Trendel had been taking the medication Coumadin, commonly referred to as a "blood thinner," for several years. Upon her admission to Clare Oaks, her dosage of Coumadin was managed by Dr. Bigol. Although the evidence demonstrated some irregularities in this regard, Trendel essentially received her prescribed dosage of Coumadin from the time of her admission through March 15, 2011. On March 16, 2011, a nurse at Clare Oaks named Christina Martinez documented on a lab report form and in a nurse's note that she had spoken by telephone with Dr. Bigol and he had ordered Trendel's Coumadin to be discontinued. Dr. Bigol disputed that he had given this order. It is undisputed that, although Martinez documented the order in two places, she did not document it in the "physician orders" section of Trendel's medical chart, sometimes referred to by the witnesses as the "physician order sheet" or a "telephone order." It is also undisputed that Trendel did not receive Coumadin after March 16, 2011, and she suffered a stroke on March 30, 2011.

¶ 6        A. Proceedings Concerning Clare Oaks' Nursing Expert Barbara McFadden

¶ 7        The trial of this case was scheduled to commence on July 10, 2017. The record reflects that

on June 26, 2017, the parties first appeared before the assigned trial judge and filed their respective motions *in limine*. No transcript of the hearing that occurred that day is part of the record on appeal. The matter was continued to June 27, 2017, and the first motion *in limine* that the trial court addressed that day involved the testimony of Barbara McFadden, an expert witness retained by Clare Oaks, whose evidence deposition was scheduled to be taken in New York on June 29, 2017. According to that motion, Clare Oaks had disclosed that McFadden would testify that Clare Oaks and its staff complied with all applicable standards of care. However, the motion stated that, after being questioned and shown additional materials at her discovery deposition, McFadden agreed that Martinez had in fact violated the standard of care by failing to write on the physician order sheet in Trendel's chart that Dr. Bigol had ordered Trendel's Coumadin to be discontinued on March 16, 2011, and by failing to indicate that it was discontinued in Trendel's medication administration record. The plaintiffs' motion also stated that McFadden had agreed in her discovery deposition that Clare Oaks' director of nursing, Lakeisha Coleman, violated the standard of care applicable to her by failing to verify that all of Dr. Bigol's verbal and written orders were consistently executed and documented in Trendel's chart by the Clare Oaks staff and that Coleman also failed to comply with all applicable state and federal regulations. Finally, the motion stated that McFadden had agreed in her deposition that the nursing staff of Clare Oaks had violated the standard of care by failing to administer Coumadin to Trendel in accordance with physician orders and by failing to properly document orders by Dr. Bigol. The plaintiffs' motion sought to bar McFadden from giving trial testimony on these points that was inconsistent with her discovery deposition testimony.

¶ 8    The trial court indicated it had reviewed Clare Oaks' response to this motion and read McFadden's discovery deposition in its entirety. In ruling, the trial court stated, "I have to

confess, I have never been confronted with a situation like this. *** I think that you will find that Ms. McFadden will not be a very valuable witness." The trial court then ruled that McFadden would be limited to expressing those opinions disclosed in Clare Oaks' written disclosures and in her discovery deposition, provided they were consistent, and it would rule on specific objections after her evidence deposition had been taken.

¶ 9       The parties returned to court on June 30, 2017, and informed the trial court that McFadden's evidence deposition had not been taken as scheduled the preceding day. Clare Oaks' attorney stated to the trial court that McFadden's medical condition had prevented the deposition from proceeding but he was unaware of her present condition. The plaintiffs' attorney then stated to the trial court that the reason McFadden was testifying by evidence deposition was because she had previously informed the parties that she was scheduled to undergo knee replacement surgery on July 20, 2017. The plaintiffs' attorney stated that the attorneys had traveled to New York as planned to take the deposition. She stated that McFadden was present at the location where the deposition was to take place but, prior to commencing, she stated that she felt unwell and was calling a family member to take her home or to a hospital. The plaintiffs' attorney stated that she had offered to stay overnight and take the deposition the following day but was told that would not be fruitful.

¶ 10       In light of the impending trial date, the trial court ordered the attorney for Clare Oaks to inform the other attorneys by the end of the day regarding his intentions with respect to obtaining McFadden's trial testimony. In doing so, the trial court stated that if Clare Oaks was planning on moving to continue the trial due to McFadden's health issues, "that motion has to be brought sooner than later in front of my presiding judge." The attorney for Clare Oaks then asked the trial court if it was possible for McFadden to testify live through the use of a video conferencing

system, instead of appearing in person at the trial. The trial court stated that this was possible.

¶ 11     It does not appear from the record that any further discussion occurred regarding McFadden until July 10, 2017, the day that the trial was scheduled to commence. On that day, Clare Oaks presented the trial court with an emergency motion to continue the trial on the basis of McFadden's unavailability. The motion itself indicated that McFadden's health problems were continuing and that she "will be examined by a cardiologist tomorrow and has been informed that she will most likely have to undergo an angiogram." No affidavit was attached to the motion. Instead, a letter from a physician was attached. The letter, dated July 5, 2017, stated that McFadden was currently under the author's care for lumbar radiculopathy and disc herniation and that any undue stress would exacerbate her symptoms, causing debilitating back pain. It stated that she is unable to testify "because she is unable to sit or stand for long periods of time due to her condition."

¶ 12     The trial judge transferred the motion to the presiding judge of the circuit court's law division. The plaintiffs' attorney objected to the motion on the basis that it failed to satisfy the requirements of Illinois Supreme Court Rule 231(a) (eff. Jan. 1, 1970). The plaintiffs' attorney recited the procedural history set forth above concerning McFadden. The presiding judge denied the motion, and the case was transferred back to the trial judge to proceed with the jury trial.

¶ 13                              B. Proceedings at Trial

¶ 14     The trial commenced with the testimony of Christine Pignatiello, the plaintiffs' expert witness on issues concerning nursing and nursing home administration. Pignatiello testified that she was licensed as a registered nurse and nursing home administrator, and she worked as the executive director of a 133-bed skilled nursing facility. She had previously worked as a director of nursing at nursing homes during various periods in her career. She testified that she reviewed

various medical records and depositions pertinent to the case, as well as federal and state regulations pertaining to nursing homes. Pignatiello testified that one of the depositions she reviewed was McFadden's and that in doing so she discovered that McFadden had identified instances in which Clare Oaks failed to meet the standard of care. Pignatiello stated that she had discovered that McFadden agreed that Martinez should have written a "physician order" when she spoke with Dr. Bigol on March 16, 2011, and she agreed that Clare Oaks' director of nursing failed to ensure that Clare Oaks' policies and procedures were followed.

¶ 15 Pignatiello also testified that certain federal regulations exist to "standardize the expectations that exist for all for all nursing facilities in the country." (These are called OBRA regulations, as they were enacted pursuant to the Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330.) Pignatiello testified that the purpose of the OBRA regulations is "to prevent harm" and "ensure that we deliver the best care possible" to patients.

¶ 16 Pignatiello explained from her review that Trendel had been admitted to Clare Oaks on February 23, 2011, for rehabilitation. Trendel had atrial fibrillation, a condition in which the heart does not beat regularly, and this increased her risk for developing blood clots and, in turn, her risk of suffering a stroke. Pignatiello testified that the drug usually given to people with atrial fibrillation is Coumadin, commonly referred to as a blood thinner, which works by increasing the time it takes for blood to clot. She testified that a patient's dose is determined by a physician, and this is based on a laboratory result obtained by a nurse called the international normalization ratio (INR). She explained that the goal is to keep a patient taking Coumadin in the therapeutic range of the INR, meaning that a range between 2.0 and 3.0 is "where we want it to be." Pignatiello explained the training that nurses undergo to learn about atrial fibrillation, its management with Coumadin, and the significance of a patient's INR.

¶ 17        Pignatiello explained that Trendel had stopped receiving Coumadin as of March 16, 2011. Trendel underwent a test that day that indicated her INR was 1.38, which was a low result. She stated that Trendel's INR had been "jumping up and down" prior to that date and thus she had been undergoing more frequent tests of her INR to keep it within the therapeutic range. She testified that the standard of care and Clare Oaks' own policies and procedures required Martinez, as the nurse caring for Trendel who obtained that INR result, to inform Dr. Bigol of the INR result of 1.38. Pignatiello testified that if, as Martinez stated in her deposition, Dr. Bigol had given Martinez an order that Trendel's Coumadin was to be discontinued that day, she would have expected Martinez to have reminded Dr. Bigol that Trendel had atrial fibrillation and questioned why Coumadin was being discontinued for her. Pignatiello explained that Martinez had testified that she did not know that she could question a physician and she felt that she should follow the physician's order regardless of what the physician said.

¶ 18        Pignatiello testified that if Dr. Bigol had persisted in giving her this order, Martinez should have written the order in the appropriate place of the chart and also informed a supervisor about it, as it would have been an unexpected order for a patient with atrial fibrillation. Pignatiello testified that the regulations required a nurse to document an order given by a physician in the "physician orders" section of a patient's medical record. She testified that if Dr. Bigol had given an order to Martinez that Trendel's Coumadin was to be discontinued, Martinez should have documented this order in the "physician orders" section of her chart, where Dr. Bigol would eventually have seen it. Martinez did not do this. Pignatiello testified that Martinez failed to comply with the standard of care by failing to bring the order to a supervisor's attention. Pignatiello also testified that Clare Oaks had a policy and procedure in place to address this situation, which stated that a nurse concerned about a doctor's order should discuss it with the

medical director and a supervisor. She testified that Clare Oaks had policies and procedures in existence but Clare Oaks' director of nursing did not educate Martinez or the rest of the nurses about these policies and, thus, Martinez was not prepared to know what to do. She testified that, at the time Martinez was providing care to Trendel, she was a new nurse and Clare Oaks had not provided her with adequate training or orientation to do so.

¶ 19        Pignatiello cited additional examples of irregularities in Trendel's chart with respect to her receiving Coumadin appropriately and the staff obtaining her INR results and documenting them in the correct place in her chart. Among these was an incident in which the nursing staff of Clare Oaks had failed to administer her Coumadin as ordered on February 27, 2011. She testified that Trendel's INR the previous day had been 1.92 and that, if Trendel had received her Coumadin as ordered, she "would expect that [her INR] would be maintained at or a little higher than that." Pignatiello testified that this posed a risk of harm to Trendel, as her risk of stroke was increased when she did not receive the Coumadin ordered by her physician. She testified that Coleman, as a reasonably careful director of nursing, should have had systems in place, such as a chart-auditing process, to identify errors such as these. Although Pignatiello stated that it was "mind boggling" to her how many errors occurred, this comment was stricken by the trial court. She testified that if Clare Oaks was acting as a reasonably careful nursing facility, including by conducting chart audits, the types of errors present in Trendel's chart would not have occurred.

¶ 20        Pignatiello testified that Clare Oaks also had a policy in place that staff should use a Coumadin flow sheet to monitor trends in patients' Coumadin dosage and response but Clare Oaks was not using Coumadin flow sheets. She testified that, if Clare Oaks had been making use of such a form, most likely somebody would have realized that Trendel was not receiving Coumadin after March 16, 2011, and questioned it. Pignatiello testified that, if Clare Oaks was

acting as a reasonably careful skilled nursing facility, this form would have been in place.

¶ 21    Pignatiello testified that section 2-104(b) of the Nursing Home Care Act required in part that all medical treatment and procedures be administered as ordered by a physician and that the facility's director of nursing or charge nurse designee shall review all new physician orders within 24 hours after issuance to assure the facility is in compliance. See 210 ILCS 45/2-104(b) (West 2010). She testified that Clare Oaks failed to comply with this provision and in doing so it violated the standard of care.

¶ 22    On cross-examination, Pignatiello agreed that the phrases "Dr. Bigol notified" and "discontinue all Coumadin 3/16/11" were written on Trendel's lab report from March 16, 2011. She also agreed that, on that date, Martinez had prepared an electronic progress note indicating that Dr. Bigol discontinued all Coumadin doses. She was shown two progress notes written by a nurse practitioner specializing in physical medicine and rehabilitation. The notes were dated March 23, 2011, and March 25, 2011, and both notes reflected that Trendel's INR had been below the therapeutic range and that her Coumadin had been discontinued on March 16. Pignatiello agreed that these were places within Trendel's chart where it could have been seen that she was not taking Coumadin after March 16, prior to her stroke on March 30, 2011. Pignatiello was also asked on cross-examination whether the OBRA regulations had any other purpose beyond preventing harm to the patient. Upon objection, a sidebar was taken, in which the attorneys discussed that an additional purpose of the OBRA regulations concerned eligibility for Medicare and Medicaid. Outside the presence of the jury, the trial judge cautioned the witness not to mention Medicare or Medicaid specifically in answering the question. Upon returning from the sidebar, counsel proceeded to ask a different question on another topic.

¶ 23    On redirect examination, Pignatiello testified that she had reviewed McFadden's opinion

that it was insufficient for a nurse to document a conversation with a physician about discontinuing Coumadin on a lab report or a nurse's note and, instead, it must be documented in a physician's order. She also confirmed that one of Clare Oaks' policies and procedures required that drug orders be recorded on the physician's order sheet in the patient's chart.

¶ 24    Edward Feldmann, M.D., the plaintiffs' expert witness in neurology, testified that on March 30, 2011, Trendel suffered a cardioembolic stroke, in which a blood clot came from the heart, passed into the brain, and blocked an artery. He explained she had atrial fibrillation, a condition that allows blood to pool in the atria of the heart, where it can clot and be shot out to other parts of the body. This put her at an increased risk for stroke. He explained that she was treated for this with Coumadin, which makes it harder for blood to clot and thereby decreased her risk of stroke by about two-thirds. He explained the INR and that the goal is for a patient's INR to be between 2 and 3. He testified that on March 16, 2011, Trendel's INR was 1.38. This meant she was not getting the expected protection from a stroke. He testified that, after that date, Trendel did not receive any further Coumadin and she did not undergo any further testing of her INR until March 30, when her INR was 1.07. He testified that if Trendel had been receiving Coumadin between March 16 and March 30, more likely than not she would not have suffered a stroke.

¶ 25    On cross-examination, Dr. Feldmann agreed that Trendel was at increased risk for stroke due to factors unrelated to her atrial fibrillation, including being diabetic and hypertensive, her gender, and her age and that Coumadin does not eliminate all risk of stroke for these conditions. On redirect examination, Dr. Feldmann stated that these other risk factors did not cause Trendel's stroke but rather they made her atrial fibrillation more risky.

¶ 26    At several points prior to the cross-examination of Dr. Feldmann, the trial court addressed the issue of the extent to which the attorney for Clare Oaks could make use of a letter to Dr.

Bigol from cardiologist Andrei M. Pop, M.D., dated March 22, 2011. In that letter, Dr. Pop informed Dr. Bigol that he had seen Trendel that day. As part of his assessment and plan, Dr. Pop had noted her atrial fibrillation and written, "off [C]oumadin per Dr. Bigol. Unsure of reason for discontinuation." This issue had initially come up during motions *in limine*, when Dr. Bigol's attorneys sought to bar use of it on the basis that the evidence showed it was not actually received by Dr. Bigol until April 4, 2011, after Trendel's stroke had already occurred. In argument, the attorney for Clare Oaks had informed the trial court that he was not planning to introduce the letter into evidence in Clare Oaks' case-in-chief, but he wanted to use it on cross-examination of Dr. Feldmann to ask him about the fact that Dr. Pop did not place Trendel back on Coumadin pursuant to the note. The trial court ruled that, because no expert testimony had been disclosed that criticized Dr. Pop or stated that he failed to meet the standard of care, Clare Oaks' attorney could not use the letter for that specific purpose. The trial court ruled that other uses could be made of the letter on cross-examination, if it was one of the materials Dr. Feldmann relied upon in forming his opinions. Cross-examination proceeded, and the attorney for Clare Oaks did not ask Dr. Feldmann any questions about the letter.

¶ 27 Coleman testified that she was a registered nurse who served as the director of nursing for Clare Oaks between August 2010 and July 2011. She testified that, as director of nursing, she was responsible under the federal and state regulations for supervising and overseeing the nursing staff and for the orienting and training of new nurses. She testified that the standard of care requires that, when a physician gives a verbal order to a nurse over the telephone, the nurse must write the order on a physician order sheet or a telephone order sheet in the patient's chart, where it can ultimately be signed by the physician. She testified that a nurse can make a note on a lab report but it must be then transferred to a physician order or a telephone order sheet. She

agreed that Martinez did not do this with respect to the notation to discontinue Coumadin on Trendel's March 16, 2011, lab report. She testified that Clare Oaks did not use a Coumadin flow sheet at the time of Trendel's treatment, but rather the staff would just use the lab sheets instead.

¶ 28 Coleman testified that the judgment of whether Coumadin should be discontinued if a patient's INR was below the therapeutic range was for a physician to make. She agreed that she would expect the nurses that she supervises to follow the policy and procedure of Clare Oaks that, if they have concerns about how test results have been handled, they should communicate such concerns to the director of nursing or the medical director. She testified that nurses should know that it is appropriate to question a physician's orders and that they do not have to blindly follow them. She was questioned extensively about the nightly chart-audit process that Clare Oaks had in place for ensuring that all orders that were given were documented appropriately in the patient's chart and that medications were administered to patients as ordered. She was questioned about various inconsistencies in Trendel's chart concerning the administration of Coumadin to Trendel and why the chart-audit process did not reveal these inconsistencies.

¶ 29 Hart-Carlson testified that she was the administrator of Clare Oaks as of the time when Trendel was a resident there. She testified that she is not a nurse. In her role as administrator, she oversaw the overall operation of the facility, including social services, activities, admissions, marketing, and the nursing department. Her responsibilities as administrator involved managing department directors, including Coleman as director of nursing. She testified that the director of nursing was responsible for properly managing a patient's medication at Clare Oaks. She also testified that, as administrator, she had a role along with the director of nursing in making sure that Clare Oaks' policies and procedures were implemented. She testified that, at some point prior to Coleman's termination in the summer of 2011, although she did not know when, she

became aware that Coleman was not making sure that the staff was following policies and procedures. She thus had a conversation with Coleman in which they discussed that Coleman needed to improve in her role as director of nursing to ensure that the staff was following the policies and procedures. Hart-Carlson also testified about the chart-audit process that existed at Clare Oaks and that the purpose of the chart audit was to ensure that medications that were ordered, held, or discontinued were properly reflected on the patient's medication administration record. She testified that Coleman was responsible for managing the chart audit process. She also testified that she had acted as a reasonably careful administrator at Clare Oaks in 2011.

¶ 30    Martinez testified that, in March 2011, she was a new nurse who had just started working at Clare Oaks. She had never previously worked at any other facility prior to working there. She did not undergo any formal training program when she started working at Clare Oaks, but rather she shadowed another nurse. She testified that she did not remember whether she had ever read Clare Oaks' policy and procedure manual. She had no independent memory of caring for Trendel or of speaking to Dr. Bigol on March 16, 2011. Based on her charting, she believes she had a conversation with Dr. Bigol that day in which she reported Trendel's lab results to him, including that her INR was 1.38. She agreed that, if Dr. Bigol gave her an order to discontinue the Coumadin, she was required to write a physician order on a telephone order sheet. She admitted that she did not do so, but she did document the conversation with Dr. Bigol and his order in a nursing note and on the lab result form. She also agreed that she was required to document it on the patient's medication administration record. She testified that she would not have questioned Dr. Bigol's order to discontinue Trendel's Coumadin, because he was the doctor. She testified that she had concerns because Trendel's INR of 1.38 was low but it was not critical and that she had made the physician aware of it. She was questioned extensively about

her knowledge of therapeutic INR levels and the implications to a person with atrial fibrillation of having an INR below the therapeutic level. She consistently answered that the therapeutic level depended on the patient and it was for a doctor and not her to assess the significance of a given patient's INR.

¶ 31    Dr. Bigol testified that he had been the medical director of Clare Oaks since 2008 and he was also Trendel's personal doctor when she was at Clare Oaks. Dr. Bigol testified that he did not give an order to Martinez on March 16, 2011, that Trendel's Coumadin should be discontinued when her INR was 1.38. He agreed that it would have been a violation of the standard of care for him to do so. Rather, his plan as of March 16 was to continue Trendel's Coumadin therapy. However, he acknowledged she never received Coumadin after March 16.

¶ 32    He testified that Clare Oaks had a system in place in 2011 that was designed to prevent what happened to Trendel but that it did not operate in the way it was designed and Trendel was harmed as a result. He explained that, when nurses take telephone orders from him, he expects them to write telephone orders. That is part of the system he relies on, as he will later review and sign the order to confirm it was his order. He also expects that, if a nurse receives an order from him for Coumadin that appears to the nurse to be inconsistent with the patient's long-term care plan, the nurse should question him about it. He expected the nurses at Clare Oaks to have sufficient training to know that an order discontinuing Coumadin on a patient with an INR below the therapeutic level was something that should be brought to his attention or to the attention of the director of nursing or other physicians at Clare Oaks.

¶ 33    He explained that Clare Oaks also had a policy in place that the staff should make use of a Coumadin flow sheet to keep all the pertinent information about a patient's Coumadin and INR levels in one place. He testified that Clare Oaks did not implement usage of a Coumadin flow-

sheet. He agreed that it was likely that, if Clare Oaks had a Coumadin flow-sheet in place for Trendel, the error at issue likely would have been caught. He explained that Clare Oaks also had a 24-hour audit process, in which each nurse on the night shift was to review the orders and the medications every 24 hours, to make sure that no mistakes were being made. He expected that the audit process should have detected an error such as the one that occurred in Trendel's case.

¶ 34 He testified that, if Martinez had written an order on March 16 to discontinue Coumadin in the physician phone orders section of Trendel's chart, he would have seen that order on March 22, 2011, when he came to Clare Oaks and reviewed other orders. If he had seen an order from March 16 to discontinue Coumadin, he would not have signed such an order. Instead, the standard of care would have required him to order an INR done immediately and to implement medication to ensure that her INR was returned to a therapeutic level, as he would have realized then that Trendel's being off Coumadin for six days put her at great risk for stroke. He testified that, more likely than not, Trendel suffered the stroke on March 30 because she did not receive her Coumadin for 14 days.

¶ 35 He testified that he does not routinely look in a patient's chart at lab result forms or nurses' progress notes regarding a patient, even though they are part of the chart, but rather he looks at the telephone order sheets in the patient's chart. However, he knows that nurses write on the lab results "all the time." He acknowledged that the lab results and the nurse's progress notes were available in Trendel's chart for him to look at and, if he had gone into the chart after March 16 and looked at them, he would have seen that she was not getting Coumadin.

¶ 36 During Dr. Bigol's cross-examination, the attorney for Clare Oaks sought to question him with the two notes of the nurse practitioner who saw her on March 23 and March 25. On the March 23 note, the nurse practitioner wrote, "INR was subtherapeutic [and discontinued] on

3/16/11 [slash] Dr. Bigol." The March 25 note reflected that the patient was "off therapeutic Coumadin." The trial court sustained an objection to the use of these notes by the attorneys for the plaintiff and Dr. Bigol, reasoning that no expert witness had been disclosed to give testimony critical of the nurse practitioner for noticing in the chart that Trendel's Coumadin had been discontinued and not taking action.

¶ 37     Mark Lachs, M.D., the plaintiff's expert witness in geriatric medicine, testified that Dr. Bigol violated the standard of care in his capacity as Trendel's attending physician when he stopped monitoring her INR levels after March 16, as he should have recognized that up to that date he had been diligently monitoring it and had known that it had been "fluctuating throughout the course of her stay." He testified that it would have been a violation of the standard of care if Dr. Bigol had ordered Trendel's Coumadin to be discontinued on March 16 if he had been informed of an INR of 1.38. Instead the standard of care required him to escalate her dose to raise her INR level to the therapeutic level and to repeat her INR testing in one or two days.

¶ 38     Dr. Lachs was asked what the standard of care required of a doctor receiving information such as an INR and responding with an order. In his answer, he explained that the lab is typically read back and repeated, and then the physician gives the order on any change in the dosage of Coumadin and follow-up INR testing to the nurse. The nurse then reads the order back. He went on to answer that a lab sheet is not the proper place for a nurse to enter an order, but the attorney for Clare Oaks raised an objection, which was sustained. Dr. Lachs was then asked what his "expectation" would be as an attending physician ordering Coumadin to be discontinued, regarding where such an order would show up. An objection was made to the word "expectation," which was overruled. Dr. Lachs then answered that his expectation would be that he would give an order, the nurse would read it back, and the order would be transcribed into the physician

order sheet or telephone order sheet. Dr. Lachs then testified that, if the nurse did not read the order back to him, the standard of care required Dr. Bigol to request the nurse to read it back.

¶ 39    Dr. Lachs also testified that Dr. Bigol, in his capacity as medical director of Clare Oaks, failed to comply with the governing regulations or the standard of care to implement resident care policies within the facility. He testified that, in his review of materials, Clare Oaks' policies and procedures were not appropriately implemented. Asked what his evidence was for this statement, he stated there were "so many examples of this." He then cited the requirement that telephone orders be read back so medication errors are not made, that Coumadin flow-sheets be used so the history of a patient's dosing and INR is centralized in one place, and that the director of nursing had testified that nurses were given wide latitude and discretion in the ways that they responded to implementing care. He then testified that he would have expected the medical director of Clare Oaks to be aware of these deficiencies, particularly because he was a practicing physician there. Dr. Lachs then testified at length to Trendel's course of medical treatment made necessary by the stroke and the effect of the stroke on her life prior to her death on March 15, 2015. He testified that but for the stroke on March 30, 2011, Trendel would not have died when she did or how she did.

¶ 40    On cross-examination by the attorney for Clare Oaks, Dr. Lachs agreed that the notation by Martinez to discontinue Coumadin on the March 16 lab results and her progress note from that day were part of Trendel's chart. He agreed that she was seen by a nurse practitioner on March 23 and March 25, and the notes from those two dates were also part of Trendel's chart that could have been seen by anyone who looked. He agreed that she was seen by a cardiologist on March 22. Dr. Lachs was asked what the cardiologist was addressing, at which point the trial court sustained an objection based on the previous ruling on the motion *in limine* involving Dr. Pop.

¶ 41      On cross-examination by the attorney for Dr. Bigol, Dr. Lachs agreed that, until Dr. Bigol signed a telephone order or physician's order and that order was in Trendel's chart, nobody at Clare Oaks was supposed to be stopping Trendel's Coumadin. He agreed that, if the staff at Clare Oaks was going to stop her Coumadin, someone should have called him and asked if they were supposed to be doing that because no order was seen in the chart. He also agreed that it would be reasonable for Dr. Bigol to expect that the nurses at Clare Oaks would have an understanding of the patient's condition, the medications the patient was receiving, and why the patient was receiving those medications. He was asked, based on his review of Martinez's deposition testimony, what he thought of her knowledge of Coumadin, and he described it as "aberrant." He answered in the affirmative when he was asked whether he would expect as an attending physician that any error in the discontinuation of Trendel's Coumadin caught by a chart audit would be brought to his attention and whether he would expect that a nurse caring for a patient with atrial fibrillation would understand what Coumadin is used for and what an INR value means. Finally, he was asked on cross-examination whether he knew whether Clare Oaks was making use of Coumadin flow-sheets at the present time, and an objection to this question was sustained.

¶ 42      Leo Kanev, M.D., a family medicine physician retained as an expert witness by Dr. Bigol, testified that Dr. Bigol complied with the standard of care, both as Trendel's attending physician and as the medical director of Clare Oaks. He testified that, if Dr. Bigol had in fact said to Martinez to discontinue Trendel's Coumadin, his expectation is that Martinez, even as a new nurse with minimal experience, should have recognized that this was an unusual order, asked him to confirm that this was in fact the order, and possibly even questioned the validity of the order. He testified that, if a physician gave an order over the telephone, the nurse should have written it on a telephone order slip and entered it into the patient's medication administration

record. He explained that the purpose of this is that telephone order slips are ultimately given to the physician to sign, so that the physician can confirm that he or she did give the order and ensure that it is correct. He testified that Clare Oaks also had a procedure of audits that should have been completed every 24 hours to catch any inconsistencies between orders and medications administered to patients. He testified that an attending physician such as Dr. Bigol "should be able to rely on the systems in place."

¶ 43     On cross-examination, Dr. Kanev stated there were multiple systems that failed at Clare Oaks, one of which was that policies and procedures were not followed. Dr. Kanev agreed that Martinez's qualifications were inadequate to care for a patient like Trendel. He testified that another area was that Coumadin flow-sheets were not being used as directed by the existing policy and procedure.

¶ 44     The issue of Dr. Pop's testimony was readdressed in the context of an indication by Clare Oaks' attorney that he intended to call Dr. Pop personally as a witness. Dr. Pop's discovery deposition was not taken. The plaintiff filed a motion *in limine* to bar Clare Oaks from calling him, on the basis that Clare Oaks was seeking to elicit testimony from Dr. Pop that was contrary to its disclosures under Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2007), which stated that Dr. Pop's testimony would be that the care and treatment he rendered to Trendel was appropriate and that nothing he did or failed to do caused or contributed to causing her injuries. Clare Oaks' attorney indicated that he intended to ask Dr. Pop to confirm that he did not put Trendel on Coumadin. The trial court granted the plaintiffs' motion *in limine* to bar Dr. Pop's testimony.

¶ 45     In addition to Dr. Kanev, Dr. Bigol had disclosed a second expert witness, cardiologist Dan Fintel, M.D., who did not testify at the trial. Prior to trial, the plaintiffs had filed a motion *in limine* to bar Dr. Fintel's testimony on the basis that it was cumulative of the testimony by Dr.

Kanev. Dr. Bigol's attorney ultimately agreed that most of the testimony was cumulative. The one aspect of Dr. Fintel's testimony that all parties agreed was not cumulative was an opinion by him that even if Trendel's Coumadin had been restarted on March 22, 2011, it would not have prevented Trendel's stroke. Dr. Bigol's attorney stated to the trial court that the reason this opinion was disclosed was the comment in Dr. Pop's letter of March 22, which the trial court had previously barred the attorney for Clare Oaks from cross-examining witnesses with. Because testimony was not introduced on that issue, the attorney for Dr. Bigol indicated he did not intend to call Dr. Fintel. However, the attorney for Clare Oaks then indicated that he intended to call Dr. Fintel, whose opinion Clare Oaks had adopted as its own, to testify only as to the noncumulative matter concerning Dr. Pop's letter. The trial court granted the plaintiffs' motion *in limine* to bar the testimony of Dr. Fintel, on the basis that Clare Oaks could not call Dr. Fintel solely to bring out the contents of Dr. Pop's letter that it had previously barred Clare Oaks' attorney from cross-examining the medical witnesses with.

¶ 46    After closing arguments and upon consideration of all the evidence and testimony, the jury found in favor of Dr. Bigol and Hart-Carlson and against the plaintiffs on the counts against them. The jury returned a verdict in favor of the plaintiffs against Clare Oaks, and it assessed damages in the amount of $4,111,477.66. Of that total, $250,000 was allocated for the damages suffered by Trendel's children following her death, for the counts under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2016)). The remainder was for damages suffered by Trendel prior to her death. The trial court entered judgment on the verdict.

¶ 47    Clare Oaks filed a timely posttrial motion seeking a new trial on all issues, which was denied by the trial court.

¶ 48                                  C. Motion for Attorney Fees and Costs

- 21 -

¶ 49    After the trial, the plaintiffs filed a motion pursuant to section 3-602 of the Nursing Home Care Act (210 ILCS 45/3-602 (West 2016)), seeking to recover their attorney fees and costs from Clare Oaks. The plaintiffs argued in their motion that, as their contract with their attorney provided that they would pay a contingent attorney fee equal to one-third of the amount recovered from Clare Oaks, they were entitled to receive attorney fees from Clare Oaks in the amount of $1,370,492.55, which is one-third of the total verdict of $4,111,477.66. Their motion also sought to receive costs from Clare Oaks in the amount of $151,694.40, which included expenses for testifying experts' fees, trial exhibits, trial technology and video editing, obtaining medical records, court costs, fees of court reporters and videographers for depositions, fees of court reporters for trial, production expenses for a day-in-the-life video, mediation costs, and expenses of travel for McFadden's deposition. Attached to the motion were affidavits from Michael Mertz and Tara Devine, both of whom averred that they were attorneys experienced in litigating cases under the Nursing Home Care Act, that contingent-fee contracts were the standard arrangement for the payment of attorney fees in such cases, and that a one-third contingency fee rate was reasonable. Also attached was an affidavit by Steven M. Levin, the senior partner of the law firm that represented the plaintiffs. Levin's affidavit set forth his experience in similar cases and the work involved by his law firm in this case. No detailed time entries were filed with the motion.

¶ 50    Clare Oaks filed a response to the plaintiffs' motion. It argued that the motion was inadequate to support the requested fees and costs, that the plaintiffs could not recover fees for damages allocated to the wrongful death claims, that the fee award should be reduced to reflect claims on which the plaintiffs were not successful, and that the plaintiffs could not recover costs beyond those allowed under section 5-108 of the Code of Civil Procedure (735 ILCS 5/5-108

(West 2016)). In reply, the plaintiffs submitted additional estimates of the hours their attorneys had spent working on their case. Based on their reconstruction of the time they had spent working on the case, the plaintiffs' attorneys estimated that they had spent 3043.55 hours working on the case.

¶ 51 The trial court conducted an evidentiary hearing on the plaintiffs' motion. At the hearing, the plaintiffs presented the testimony of Levin in support of their claim for fees, and Clare Oaks presented the testimony of an expert witness, attorney James Chapman, in opposition to the claim. Both parties were allowed to conduct cross-examination of the opposing party's witnesses and make their arguments on the issue of the reasonableness of the fees sought. At the conclusion of the hearing, the trial court found that a fee award equal to the amount of the contingency fee was appropriate. Thus, it awarded fees to the plaintiffs in the amount of $1,370,492.55, which was one-third of the total verdict of $4,111,477.66. It also awarded costs in the amount of $147,471.55, which was slightly less than the amount sought by the plaintiffs. Clare Oaks filed a timely notice of appeal.

¶ 52                                      II. ANALYSIS

¶ 53                          A. Motion for Continuance of Trial

¶ 54 Clare Oaks' first argument on appeal is that the trial court denied it a fair trial when the court denied its motion to continue the trial due to McFadden's unavailability. Clare Oaks points out that McFadden, its expert witness on nursing issues, would have testified that the nursing staff of Clare Oaks complied with the applicable standard of care with respect to Trendel, specifically that its staff acted appropriately in titrating, holding, administering, and discontinuing Trendel's Coumadin therapy according to Dr. Bigol's orders and that Martinez properly documented the order by Dr. Bigol to discontinue Coumadin in Trendel's chart. Clare

Oaks contends that McFadden became ill days before the trial was set to begin and it moved to continue the trial on that basis. Clare Oaks argues that the trial court's denial of this motion forced it to try the case without an expert witness to defend the conduct of its nursing staff.

¶ 55 A litigant does not have an absolute right to a continuance, and the decision to grant or deny a motion for a continuance is vested in the sound discretion of the trial court. *Andersonville South Condominium Ass'n v. Federal National Mortgage Co.*, 2017 IL App (1st) 161875, ¶ 28. A party seeking a continuance once the case has reached the trial stage must provide the court with an especially compelling reason for a continuance because of the inconvenience caused to the other parties, attorneys, witnesses, and the court. *Id.* ¶ 30. A reviewing court will not reverse a trial court's denial of a continuance " 'unless it has resulted in a palpable injustice or constitutes a manifest abuse of discretion.' " *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 22 (quoting *Wine v. Bauerfreund*, 155 Ill. App. 3d 19, 22 (1987)).

¶ 56 Section 2-1007 of the Code of Civil Procedure allows for the granting of continuances in the discretion of the trial court upon a showing of good cause. 735 ILCS 5/2-1007 (West 2016). That section further provides that "[t]he circumstances, terms and conditions under which continuances may be granted, the time and manner in which application therefor shall be made, and the effect thereof, shall be according to rules." *Id.* Illinois Supreme Court Rule 231(a) (eff. Jan. 1, 1970), requires that, if a party "applies for a continuance of a cause on account of the absence of material evidence, the motion shall be supported by the affidavit of the party so applying or his authorized agent." That rule further provides that the affidavit shall show

"(1) that due diligence has been used to obtain the evidence, or the want of time to obtain it; (2) of what particular fact or facts the evidence consists; (3) if the evidence consists of the testimony of a witness his place of residence, or if his place of residence is not known, that

due diligence has been used to ascertain it; and (4) that if further time is given the evidence can be procured." *Id.*

¶ 57    In this case, Clare Oaks sought a continuance of the trial on account of the absence of material evidence, that being McFadden's testimony. In doing so, however, Clare Oaks did not support its motion with an affidavit as required by Rule 231(a). This court has held that a party's failure to provide an affidavit in support of a motion for continuance constitutes a sufficient basis upon which a trial court may deny such a motion. *Farrar v. Jacobazzi*, 245 Ill. App. 3d 26, 30 (1993). Thus, on this basis alone, the trial court did not abuse its discretion in denying Clare Oaks' motion.

¶ 58    However, even overlooking the absence of an affidavit, we would find no abuse of discretion in the trial court's denial of Clare Oaks' motion. As discussed in the background section above, the attorneys for Clare Oaks were aware well in advance of trial that McFadden may not be available to testify live, due to the fact that she was scheduled to undergo knee replacement surgery 10 days after jury selection was set to begin. Therefore, the attorneys traveled to New York to take her evidence deposition 11 days before the trial was scheduled to begin. When she did not proceed to sit for her evidence deposition because she felt lightheaded, the plaintiffs' attorney offered to stay in New York overnight and take her deposition the following day, but Clare Oaks' attorney apparently informed her that doing so would not be fruitful. After being informed 10 days before trial that McFadden's evidence deposition had not proceeded, the trial court ordered the attorney for Clare Oaks to inform the other attorneys by the end of the day regarding his intentions with respect to obtaining her trial testimony. Further, the trial court informed the attorneys that it would be feasible for McFadden to testify remotely at trial through a video conferencing system if she was unable to travel to Illinois. As another

alternative, it would seem equally likely that she could have provided an evidence deposition by remote electronic means, even if it had to be taken after the trial began. See Ill. S. Ct. R. 206(h) (eff. Feb. 16, 2011). Clare Oaks made no effort to demonstrate that none of these were viable options for obtaining McFadden's trial testimony. Considering all of this, we cannot say that Clare Oaks acted with sufficient diligence to obtain McFadden's testimony at trial. Clare Oaks suffered no palpable injustice from the denial of the motion for continuance, and the trial court did not abuse its discretion.

¶ 59                                    B. Testimony of Pignatiello

¶ 60        Clare Oaks' second argument on appeal is that the trial court abused its discretion by permitting Pignatiello, the plaintiffs' expert witness on issues pertaining to nursing and nursing home administration, to exceed the bounds of permissible expert testimony in several respects. First, it contends that the trial court permitted her to express opinions that, as a nurse, she lacked the foundational expertise to express. Second, it contends that she improperly repeated portions of McFadden's discovery deposition testimony and thus testified to hearsay. We address these arguments in turn. As they concern the admissibility of evidence, which is a matter for the sound discretion of the trial court, we will not reverse the decisions of the trial court unless that discretion has been clearly abused. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 92 (1995).

¶ 61                          1. Testimony Outside Her Expertise as a Nurse

¶ 62        In its brief, Clare Oaks identifies six instances in which it contends that the trial court permitted Pignatiello to express opinions outside her area of expertise as a nurse. In the first, Pignatiello was asked what role a nurse had in determining the appropriate dose of Coumadin for a patient. She ultimately answered that the dose was determined by the physician after a nurse

obtains the patient's INR and reports it to the physician. She began her answer, however, by explaining that Coumadin was a drug given to people with atrial fibrillation and it increases the time it takes for blood to clot. The attorney for Clare Oaks objected that this testimony was beyond her expertise, as she was not a physician. The trial court overruled this objection.

¶ 63        Clare Oaks argues that this testimony, as well as the following four instances discussed below, "violated foundational prerequisites," citing *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 114-16 (2004), and the appellate court's opinion in *Gill v. Foster*, 232 Ill. App. 3d 768, 779-81 (1992), *aff'd on other grounds*, 157 Ill. 2d 304 (1993). These cases stand for the proposition that, for an expert witness to testify on the standard of care in a medical negligence case, the foundational requirements that must be satisfied are "that the health-care expert witness must be a licensed member of the school of medicine about which the expert proposes to testify; and that the expert must be familiar with the methods, procedures, and treatments ordinarily observed by other health-care providers in either the defendant's community or a similar community." *Sullivan*, 209 Ill. 2d at 114-15; see also *Gill*, 232 Ill. App. 3d at 781. In *Sullivan*, the supreme court held that a physician specializing in internal medicine was not competent to testify regarding the standard of care for the nursing profession and the subject nurse's deviation therefrom. *Sullivan*, 209 Ill. 2d at 119. In *Gill*, the appellate court held that a general surgeon was not qualified to testify to the standard of care applicable to radiologists. *Gill*, 232 Ill. App. 3d at 785. However, the supreme court, applying the same foundational requirements set forth above, held that the plaintiff's expert surgeon, as a physician licensed to practice medicine in all its branches who had also demonstrated sufficient familiarity with the pertinent methods and procedures, was qualified to testify to the standard of care of a radiologist. *Gill v. Foster*, 157 Ill. 2d 304, 317 (1993).

¶ 64        Clare Oaks does not dispute that Pignatiello satisfies these prerequisites, in that she was licensed in the same school of medicine about which she proposed to offer testimony against Clare Oaks, that being nursing and nursing home administration, and she was familiar with the nursing methods, procedures, or treatments pertinent to this case. Further, we find that *Sullivan* and *Gill* are inapposite to the question of whether Pignatiello's testimony regarding the purpose of the drug Coumadin and its effect on patients had sufficient foundation. The issue in *Sullivan* and *Gill* involved the scope of testimony by physicians on the standard of care of nurses or physicians in other specialties, and neither case involved the extent to which a nurse may testify about matters touching upon medical issues. The significance of *Sullivan* to this question, however, is its recognition that expert testimony on the standard of care applicable to nurses appropriately comes from a witness licensed in the profession of nursing. *Sullivan*, 209 Ill. 2d at 123. Such testimony will necessarily touch upon medical matters to some extent.

¶ 65        Here, we find no abuse of discretion by the trial court in allowing Pignatiello to testify to the purpose of Coumadin and generally how it worked to reduce the risk of strokes in patients with atrial fibrillation. There is no bright-line rule that prohibits testimony concerning medical matters by health-care witnesses who are not licensed physicians. See *Valiulis v. Scheffels*, 191 Ill. App. 3d 775, 786 (1989). Rather, a proper foundation for expert testimony exists when it is shown that the expert has specialized knowledge or experience in the area about which the expert expresses his or her opinion. *Id.* at 785; see also Ill. R. Evid. 702 (eff. Jan. 1, 2011). In this case, Pignatiello explained during her testimony that, during nursing school, nurses learn what atrial fibrillation is and how that condition is managed with a physician as a team. She testified that nurses also take a pharmacology course, in which they learn about Coumadin and its relationship to atrial fibrillation. She testified that it is important that nurses understand the significance of the

fact that a given patient is on Coumadin and has a particular INR, as this is information that a nurse needs to know to report to a physician because it may affect how the physician treats the patient. Furthermore, all of the witnesses in this case were in agreement that nurses need to know about atrial fibrillation, its treatment with Coumadin, and the significance of a particular INR. Thus, we find that a sufficient foundation existed for this testimony by Pignatiello.

¶ 66     The second instance in which Clare Oaks contends Pignatiello was allowed to testify beyond her expertise as a nurse occurred when she was asked, referencing Trendel's INR lab report from March 16, 2011, to explain to the jury how lab reports are read and what information is included within such reports. In doing so, she pointed out that the lab report included the "reference range" for an INR as being 2.0 to 3.0, stating, "This is where we want it to be." The attorney for Clare Oaks objected that the testimony about "where we want it to be" was beyond her qualifications as a nurse. The trial court overruled the objection, and we find no abuse of discretion in this ruling. A sufficient foundation was established at trial for Pignatiello, as a nurse, to explain to the jury what a reference range was on a lab report and specifically the reference range for a patient's INR. The fact that this is information that a nurse must understand was repeatedly established at trial.

¶ 67     In the third instance cited by Clare Oaks, Pignatiello was asked whether a low INR presented a risk to the patient. She answered that, if the INR was too low in a patient with atrial fibrillation, it could possibly increase the risk of stroke. At that point, the attorney for Clare Oaks objected. The trial court sustained the objection and instructed the jury to disregard the answer. However, in a later question, Pignatiello was asked whether the fact that Trendel missed her dose of Coumadin on February 27, 2011, posed a risk of harm to her. She answered that not getting the Coumadin ordered by her physician increased her risk of stroke. The attorney for Clare Oaks

objected that she was not a physician, and the trial court overruled the objection. For the reasons discussed above, we find that a sufficient foundation was established for Pignatiello to express this testimony and that there was no abuse of discretion in allowing it.

¶ 68　　　In the fourth instance, Pignatiello was asked if Coumadin was the kind of drug that could be given in the same dose for weeks on end. The trial court overruled an objection to the question on the grounds that she was not a physician. She answered that, in a patient like Trendel, her INR had been "jumping up and down," so she was having frequent INR tests because there was a need for frequent adjusting of her Coumadin dosage to keep her within the therapeutic range. Again, for the same reasons discussed above, we find no abuse of discretion in allowing Pignatiello to express this testimony.

¶ 69　　　In the fifth instance, Clare Oaks states that Pignatiello was allowed to state her expectation of what a physician would order if the physician learned that a patient's INR was 1.38. However, no such testimony appears on the page of the record cited by Clare Oaks in its brief. The plaintiffs point out this fact in their brief, but Clare Oaks' reply brief does not clarify the citation. As Clare Oaks has failed to cite where in the record on appeal the objectionable testimony may be found, any argument on this point is forfeited. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018).

¶ 70　　　The sixth instance in which Clare Oaks argues that Pignatiello was permitted to testify beyond her expertise involves her reading a provision of the Illinois Administrative Code concerning resident care policies. Clare Oaks contends that the trial court permitted Pignatiello to testify as a legal expert by advising the jury of the applicable law. Clare Oaks cites eight pages of the trial transcript for this proposition, but it appears that the only objection occurred when she was asked, "And what is this law?" At that point, the attorney for Clare Oaks asked for a standing objection that "it" (apparently referring to the Illinois Administrative Code provision at

issue) is not a law, but rather it was a regulation. There was no objection to allowing Pignatiello to read the text of regulation at issue. An objection to evidence based upon a specific ground is a waiver of objection on all grounds not specified. *Russo v. Corey Steel Co.*, 2018 IL App (1st) 180467, ¶ 40. Thus, by failing to object on the grounds that Pignatiello should not be allowed to read the regulation at issue, Clare Oaks has waived this objection to her testimony.

¶ 71       In the context of its argument that Pignatiello was allowed to testify beyond her expertise concerning regulations applicable to nursing homes, Clare Oaks also argues that the trial court improperly curtailed its examination of Pignatiello concerning "Congress' true intent" in promulgating the OBRA regulations, which, it asserts, was "determining whether a facility meets the requirements for Medicare/Medicaid participation." During her testimony, Pignatiello testified that the OBRA regulations existed to "standardize the expectations that exist for all nursing facilities in the country" and their purpose was "to prevent harm" and "ensure that we deliver the best care possible." During cross-examination, when Pignatiello was asked whether the OBRA regulations had any other purpose beyond preventing harm to patients, the plaintiffs' attorney objected. A sidebar was taken, after which the trial court cautioned Pignatiello not to mention Medicare or Medicaid specifically when answering the question. We find no abuse of discretion in the trial court's actions, as any evidence or suggestion that Medicare, Medicaid, or any other collateral source may have existed and paid Trendel's medical bills would be more prejudicial than probative. See *Lang v. Lake Shore Exhibits, Inc.*, 305 Ill. App. 3d 283, 288-90 (1999).

¶ 72                     2. Testimony Concerning McFadden's Deposition

¶ 73       Clare Oaks next argues that the trial court erred in permitting Pignatiello to testify regarding the opinions of McFadden, their nursing expert who did not testify at trial. It contends that, by

doing so, the trial court allowed Pignatiello to testify to hearsay. It further contends that Pignatiello's testimony amounted to her improperly "parroting" the corroborating opinions of a nontestifying witness. See *Kim v. Nazarian*, 216 Ill. App. 3d 818, 827 (1991).

¶ 74 At trial, the line of questioning at issue began when the plaintiffs' attorney asked Pignatiello what materials and deposition transcripts she had read or reviewed in formulating her opinions in the case. Among the depositions she listed was McFadden's. Over a standing of objection, Pignatiello was asked then asked what, if anything, she had discovered after reading McFadden's deposition. She answered that she had discovered that McFadden had identified certain areas in which Clare Oaks did not meet the standard of care, specifically that McFadden had agreed that Martinez should have written a physician order after speaking to Dr. Bigol on March 16, 2011, and that the director of nursing had failed in her responsibility to ensure that policies and procedures were followed. Clare Oaks argues this testimony by Pignatiello is beyond the scope of testimony permissible under the principles of *Wilson v. Clark*, 84 Ill. 2d 186 (1981).

¶ 75 In *Wilson*, the supreme court adopted Federal Rule of Evidence 703, which provided that an expert may give opinion testimony at trial that relies upon facts or data not admitted in evidence, as long as the underlying information is of the type reasonably relied upon by experts in the particular field. *Id.* at 192-94; see also Ill. R. Evid. 703 (eff. Jan. 1, 2011). However, an expert must be allowed to disclose to the jury the facts and data forming the basis of the expert's opinion, because an expert's opinion is only as valid as the reasons that underlie it. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 298-99 (2002). In doing so, "it is well established that an expert may testify about the findings and conclusions of a nontestifying expert that he used in forming his opinions." *People v. Williams*, 238 Ill. 2d 125,

143 (2010) (citing *People v. Lovejoy*, 235 Ill. 2d 97, 143 (2009)); see also *People v. Pasch*, 152 Ill. 2d 133, 176 (1992). Prohibitions on the admission of hearsay are not violated when an expert discloses facts and data not admitted into evidence, including the findings or conclusions of nontestifying experts, for the purpose of explaining the basis of an opinion. *Williams*, 238 Ill. 2d at 143 (citing *Lovejoy*, 235 Ill. 2d at 142). This is because the facts and data are not disclosed for the truth of the matter asserted, but for the limited purpose of explaining the basis for the expert's opinion. *Id.* (citing *Lovejoy*, 235 Ill. 2d at 143).

¶ 76     We find that the challenged testimony of Pignatiello is permissible under these principles and there was no abuse of discretion by the trial court in allowing it. Pignatiello testified that McFadden's deposition testimony was part of what she reviewed in formulating her opinions in the case. She was thus permitted to disclose to the jury what findings or conclusions by McFadden she used in forming her opinions, which is essentially what she did. There is no rule that prohibits one party's expert witness from relying, in the formation of his or her opinions, upon findings or conclusions reached by an opposing party's expert witness. See *Poelker v. Warrensburg-Latham Community Unit School District No. 11*, 251 Ill. App. 3d 270, 294-95 (1993).

¶ 77     Further, no hearsay violation occurred here. The topic of McFadden's deposition testimony was not dwelled upon at any length during the direct examination of Pignatiello, so as to essentially turn Pignatiello's testimony into a conduit for the introduction of otherwise inadmissible hearsay. Rather, it was succinctly discussed as being information in the materials that formed the basis of Pignatiello's opinion. To the extent that Clare Oaks was concerned that the jury would misuse this information, it would have been entitled at that time to have the jury instructed that this statement by McFadden was being allowed for the limited purpose of

enabling Pignatiello to explain what she relied upon in forming her opinions and was not to be considered by them as evidence. See Illinois Pattern Jury Instructions, Civil, No. 2.04 (approved December 8, 2011). It does not appear that Clare Oaks sought to have the trial court give the jury such an instruction.

¶ 78    We find this situation to be distinguishable from *Kim*, the case relied upon by Clare Oaks. In *Kim*, testimony was elicited from two radiologists testifying as expert witnesses for the defendants that they had shown the X-rays at issue in the case to colleagues in their radiology departments, and their colleagues had agreed with them in their interpretation of the X-rays. *Kim*, 216 Ill. App. 3d at 822-25. The court held that such testimony was improper, as "neither *Wilson* nor Rule 703 allows an expert's testimony to simply parrot the corroborative opinions solicited from nontestifying colleagues." *Id.* at 827. The court found that the fact that a colleague of the expert had agreed with the expert's opinion "is of dubious value in explaining the basis of the opinion." *Id.* Further, the opposing party, who is unable to cross-examine the corroborative opinion of the expert's colleague, would be prejudiced by the admission of such testimony. *Id.* at 827-28.

¶ 79    In this case, unlike in *Kim*, Pignatiello was not testifying that she had discussed her opinions with colleagues and that those colleagues had agreed with her. Rather, her statement concerned testimony given by McFadden under oath in a deposition, which Pignatiello testified she had reviewed in formulating her opinions in the case. Further, the situation present in this case is not the equivalent of the situation in *Kim*, where the plaintiffs had no ability to cross-examine the experts' nontestifying colleagues. Here, McFadden was Clare Oaks' own expert witness. We do not believe that Clare Oaks was completely denied the ability to "cross-examine" McFadden on these opinions if it had chosen to do so, as we discussed in the preceding section

of this decision. Furthermore, Clare Oaks had the opportunity to cross-examine Pignatiello with other testimony by McFadden in her deposition to challenge her reliance upon certain statements by McFadden.

¶ 80 Apart from the testimony on direct examination discussed above, the only other mention of McFadden's testimony by Pignatiello occurred on redirect examination. During Pignatiello's cross-examination by the attorney for Clare Oaks, she had been questioned about the fact that there were places in Trendel's chart where it could have been seen prior to her stroke that she was not on Coumadin after March 16, including on the lab report, the nurse's note, and the two notes by a nurse practitioner. Then, on redirect examination, Pignatiello was asked by the plaintiffs' attorney whether she recalled what McFadden's opinion had been with respect to whether documenting a conversation in a nurse's note or lab result was sufficient to comply with the standard of care. The attorney for Clare Oaks objected that this question was beyond the scope of direct and cross-examination, but the trial court overruled that objection. Pignatiello then testified that McFadden had been of the opinion that it was not sufficient to write the conversation concerning the discontinuation of Coumadin on a lab slip or a nurse's note but, rather, it must be in a physician's order. We find no abuse of discretion by the trial court in allowing this testimony.

¶ 81          C. Testimony of Dr. Lachs

¶ 82 Clare Oaks' next argument on appeal is that the trial court denied it a fair trial by permitting Dr. Lachs, a physician specializing in geriatric medicine, to present testimony on the standard of care applicable to the nurses at Clare Oaks and their deviation from that standard. As discussed above, one of the foundational requirements necessary for an expert witness to give testimony on the standard of care in a medical negligence case is that the expert be a licensed member of the

school of medicine about which he proposes to testify. *Sullivan*, 209 Ill. 2d at 114. Clare Oaks contends that Dr. Lachs, who does not have a license in nursing, was not qualified to express a criticism of the nursing staff at Clare Oaks.

¶ 83    In the first portion of Dr. Lachs's testimony cited by Clare Oaks, he was initially asked what the standard of care required of a doctor receiving information such as an INR from a nurse and responding with an order. In his answer, Dr. Lachs explained that the lab result is typically read back and repeated, the physician gives the order on any change in the dosage of Coumadin and follow-up INR testing to the nurse, and the nurse reads that order back. He then went on in his answer to state that a lab sheet is not the proper place for a nurse to enter an order, at which point the attorney for Clare Oaks made an objection that was sustained. The next question to Dr. Lachs then was what his "expectation" would be as an attending physician ordering Coumadin to be discontinued, regarding where such an order would show up. An objection was made to the word "expectation," which was overruled. Dr. Lachs then answered that his expectation would be that he would give an order, the nurse would read it back, and the order would be transcribed into the physician order sheet or telephone order sheet.

¶ 84    We do not find this testimony by Dr. Lachs amounts to his expressing an opinion on the nursing standard of care applicable to the staff of Clare Oaks. Dr. Lachs was the physician disclosed to provide expert testimony on the standard of care applicable to Dr. Bigol, both as Trendel's attending physician and as medical director of Clare Oaks, his deviation from the standard of care, and the fact that the deviation was a proximate cause of injuries to Trendel. One of the issues in the case against Dr. Bigol was whether he was required under the standard of care to create some sort of reminder to himself to check Trendel's INR several days after March 16, independent of anything that the nursing home staff did to remind him. Dr. Lachs testified

that the standard of care required this of Dr. Bigol. By contrast, Dr. Bigol and Dr. Kanev testified that what would ordinarily constitute this reminder would be the physician's signing of a physician's telephone order slip on his next visit to the nursing home and Dr. Bigol was not required by the standard of care to create an additional reminder on his own. Therefore, this testimony by Dr. Lachs, concerning the fact that his expectation as an attending physician would ordinarily be that the order would be transcribed in a physician order sheet or telephone order sheet, was relevant and material to explain his subsequent testimony on this point concerning Dr. Bigol's deviation from the standard of care. It was not testimony pertaining to the nursing standard of care.

¶ 85    Clare Oaks next criticizes a portion of Dr. Lachs's testimony that concerned his opinion that Dr. Bigol had deviated from the standard of care in his capacity as the medical director for Clare Oaks. In that line of questioning, Dr. Lachs had first explained that one of the major roles of the medical director of a nursing home was to implement resident care policies. Over a standing objection, the following exchange then occurred:

"Q.    *** In your review of the materials, were the Clare Oaks policies and procedures appropriately implemented?

A.    No.

Q.    And what is your evidence for that?

A.    I mean, there was so many examples of this. One policy and procedure we've discussed, it is also statute, involving the careful administration and safe administration of medications, telephone orders being read back so that medication errors are not made.

Residents have the right to be free from significant medication errors. I think we

could all agree that very significant medication errors were made. Those errors, by the way, should have been reported to the medical director and the director of nursing. They were not.

There is a policy and procedure regarding Coumadin flow sheets. Very common and important to make sure that this kind of thing doesn't happen, in which the daily doses of Coumadin and the associated INRs are available in one place so you can see the history of dosing, so you can respond cohesively and intelligently.

There was testimony from nurses who had never administered Coumadin before or had experience effectively interacting with a physician over INRs and Coumadin. There was testimony from the director of nursing that gave nurses wide latitude and discretion in the ways that they responded to implementing care. It was very curious.

Q.    And you would expect that a medical director of a facility like Clare Oaks would be aware of the insufficiencies that you've just outlined?

A.    I would, particularly if he was concurrently practicing as an attending physician within the facility."

Clare Oaks contends that several of Dr. Lachs's comments in this exchange constitute impermissible testimony by him that Clare Oaks deviated from the standard of care in failing to follow its policies and procedures. Specifically, Clare Oaks cites Dr. Lachs's statements that "many examples" exist, that residents have a right to be free from significant medication errors, that the nursing staff did not read telephone orders back to physicians giving the orders, and the director of nursing giving nurses wide latitude and discretion.

¶ 86    Again, we find that the above testimony by Dr. Lachs does not constitute testimony on the nursing standard of care or the deviation by Clare Oaks' staff from that standard. Rather, it

directly pertains to Dr. Bigol and the opinion that Dr. Bigol deviated from the standard of care applicable to him as the medical director of a nursing home to ensure that the policies and procedures in existence at the nursing home were implemented. The examples were cited to explain Dr. Lachs's opinion why Dr. Bigol had deviated from the standard of care applicable to him. The examples were also cited as a predicate for the testimony that Dr. Bigol should have known they were not being implemented as an attending physician practicing at the facility. There was no error in allowing this testimony.

¶ 87        Clare Oaks cites an additional example of what it contends was Dr. Lachs providing testimony on the nursing standard of care, which occurred during his cross-examination by the attorney for Dr. Bigol. During that testimony, Dr. Lachs agreed with a question that, until Dr. Bigol signed a telephone order or physician's order and that order was made part of Trendel's chart, nobody at Clare Oaks was supposed to be stopping her Coumadin. The plaintiffs argue that Clare Oaks has waived review of this issue by failing to object to this testimony at trial, and it appears to us that the plaintiffs are correct. Although Clare Oaks' reply brief pointed out most other places in the record where a standing objection covered testimony on which the plaintiffs contended that an objection was waived, it makes no reply concerning this particular testimony. We do not see how this question was encompassed within Clare Oaks' standing objection concerning testimony by Dr. Lachs on Clare Oaks' compliance with its existing policies and procedures, and thus we find that any error in its admission was waived by the failure to make a timely objection. *Gausselin v. Commonwealth Edison Co.*, 260 Ill. App. 3d 1068, 1079 (1994).

¶ 88        Clare Oaks next cites a series of questions that Dr. Lachs answered during cross-examination by the attorney for Dr. Bigol. In the first, he was asked if he agreed "that it would be reasonable for Dr. Bigol to have expectations that the nurses at a nursing home will have an

understanding of the patient's condition, the medications the patient is receiving and why they are receiving those medications." Over objection by the attorney for Clare Oaks, he testified that he agreed. In the second, he was asked whether he would "as an attending physician have an expectation that a nurse caring for a patient with atrial fib and who is on Coumadin would understand what atrial fib is, understand what Coumadin is used for and understand what an INR value means?" He answered that he would. In the third, he was asked whether, assuming that a chart audit had been performed on March 16 and March 17, 2011, and found that an error had been made in the discontinuation of Coumadin, that would be something that as an attending physician he "would expect to be brought to [his] attention immediately." He answered, "Of course."

¶ 89        Clare Oaks contends that Dr. Lachs's answers to these three questions constitute improper testimony by him on the nursing standard of care. We do not agree. We note first that this testimony occurred on cross-examination, and the latitude which the trial court afforded to Dr. Bigol in cross-examining the expert offering opinions against him was within its discretion. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 33 (2010). It would appear that these questions to Dr. Lachs were probative as an effort to qualify or discredit the testimony of Dr. Lachs that Dr. Bigol deviated from the standard of care in failing to recognize that Trendel's Coumadin had been discontinued after March 16 and to reinstate it prior to March 30. The defense's position was basically that Dr. Bigol did not breach the standard of care, because he was entitled to rely on the staff and the procedures in place at Clare Oaks to discover that Coumadin had been discontinued on a patient with atrial fibrillation, recognize the significance of this fact for the patient, and bring it to his attention. These questions on cross-examination pertain to issues concerning Dr. Bigol's compliance with the physician's standard of care, and they do not constitute improper

testimony by him of the standard of care applicable to nurses.

¶ 90    In its brief, Clare Oaks engages in a lengthy discussion distinguishing this case from *Wingo v. Rockford Memorial Hospital*, 292 Ill. App. 3d 896 (1997). That case recognized a limited exception to the rule barring a physician from testifying to the nursing standard of care or to nurses' deviation therefrom, where the allegations of negligence at issue do not concern a nursing procedure but instead involve what a nurse is required to communicate to a physician. *Id.* at 906; see also *Sullivan*, 209 Ill. 2d at 118-19. We find that the exception to the licensing rule set forth in *Wingo* is inapposite to the above testimony of Dr. Lachs, as we have concluded that he was not expressing testimony on the nursing standard of care. Rather, Pignatiello's testimony provided ample evidence concerning the standard of care applicable to the nurses at Clare Oaks and the ways in which they deviated from the standard.

¶ 91    Finally, Clare Oaks argues that "Dr. Bigol's counsel violated the prohibition against evidence of subsequent remedial measures by driving home the point that Clare Oaks now uses a Coumadin flowsheet, despite the trial court sustaining two objections on the subject." See *Solis v. BASF Corp.*, 2012 IL App (1st) 110875, ¶ 76. In the actual testimony, the attorney for Dr. Bigol asked Dr. Lachs whether he was aware of whether Clare Oaks uses a Coumadin flow sheet at the present time. The attorney for Clare Oaks objected, and the trial court sustained the objection. Dr. Bigol's attorney then asked a very similar question, which again drew an objection. The trial court sustained the objection and instructed the witness not to answer the question. We find no error on the part of the trial court, and no testimony was actually elicited that Clare Oaks used a Coumadin flow sheet at the time of trial.

¶ 92                    D. Theory of "Systemic Indifference"

¶ 93    Clare Oaks' next argument on appeal is that it should receive a new trial because the

plaintiffs' accusations of "systemic indifference" and certain inflammatory testimony by the plaintiffs' expert witnesses urged the jury to punish Clare Oaks. It begins this portion of its brief by arguing that the trial court abused its discretion and caused it unfair prejudice by denying its motion *in limine* to prevent testimony by Pignatiello or Dr. Lachs that a "systemic" problem existed at Clare Oaks on or around March 16, 2011. In that motion, Clare Oaks cited a portion of Pignatiello's discovery deposition, in which she had testified as follows:

" 'Q.     Do you have an opinion, Christina, as whether or not there was a systemic problem at Clare Oaks?

A.     Absolutely there was a systemic problem with respect to implementing the electronic health records system, as evidence [*sic*] by the medication administration record, the several medication errors, which I have discussed and pointed out. There is a problem with the staff not knowing how to interpret those medication orders and administer them properly, and following the policies and procedures that are in place. And, apparently, also that they don't even know where to go to get the information, meaning the policies and procedures.' "

It similarly cited a portion of Dr. Lachs's discovery deposition, in which he testified as follows:

" 'Q.     So policies and procedures, they were in place, fair?

A.     Well, they were—it depends on how you define in place. They were written. They existed on a shelf somewhere but—and multiple ones weren't followed. It wasn't just they messed one up. It is aberrant, strikingly aberrant. And I would say had this been—I don't know if there was a state survey here, this would be an immediate jeopardy in most states with the potential for widespread harm because there was systemic medication problems. I don't know if that happened.' "

Clare Oaks argued in its motion that the opinions above were based on speculation, in that their opinions that a "systemic" issue existed at Clare Oaks "encompasses every aspect" of the facility's operation, despite the fact that Trendel's chart was the only material that either of them had reviewed. At the hearing on the motion, the attorney for Clare Oaks focused on the word "systemic," arguing that the word misrepresented to the jury that the case concerned an issue that was broader than a single patient.

¶ 94    In ruling on this motion, the trial court stated that it was reluctant to micromanage the word choices of witnesses. It stated that, provided a proper foundation existed for the opinions being offered, the testimony would be permitted, subject to cross-examination in which the defendants could cross-examine the witnesses about their basis for using certain words.

¶ 95    In civil cases, the law is well established that the denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994). The moving party remains obligated to object contemporaneously when objectionable evidence is offered at trial. *Id.* While there is not always a need to repeat an objection each time that similar evidence is presented following the denial of a motion *in limine*, an objection must be made the first time that evidence is introduced. *Id.* If an objection is not made, the right to raise the issue on appeal is waived. *Id.*

¶ 96    With the trial court's ruling on that motion *in limine* as its backdrop, Clare Oaks goes on to argue that the trial court's denial of that motion "set the stage for plaintiffs' counsel to attack Clare Oaks on this basis from the opening statement onward." Clare Oaks argues that the argument and testimony permitted as a result of the ruling on this motion *in limine* "invited the jury to reach an emotionally-charged verdict based on conduct not proximately related to Ms.

Trendel's treatment."

¶ 97     We note initially that Clare Oaks does not appeal any instance in which the word "systemic" was actually used by any witness at trial. Rather, Clare Oaks points initially to several comments in the opening statement by the plaintiffs' attorney. First, it points to counsel's statement, "You'll soon learn that at Clare Oaks, there is no functioning system. The system has a built-in problem that causes it to be indifferent to its patients' most pressing needs at any given time, on any given day." It then cites a later portion of the plaintiffs' opening statement, in which counsel stated,

> "So the system has no enforcement, because [Coleman] is enforcing the system; and therefore, there's no rules. Remember, when you hear the evidence in this case about policies and procedures, and you'll hear a lot of evidence because there were a lot of policies, rules without enforcement of them are the same as having no rules at all."

Finally, Clare Oaks asserts that this inappropriate argument was compounded by the plaintiffs' attorney's use of a PowerPoint and oral presentation of quotations from McFadden's deposition testimony. However, the record does not reflect any timely objection by Clare Oaks to any of these statements by the plaintiffs' attorney during opening statements, and thus any claim pertaining to them is not preserved for review. *Lovell v. Sarah Bush Lincoln Health Center*, 397 Ill. App. 3d 890, 896-98 (2010) (defendant's failure to object to comments made during plaintiff's attorneys opening statement waived its argument that such comments injected an inappropriate " 'theme' " into the case and were " 'designed to inflame the jury from the outset' ").

¶ 98     Proceeding from its criticism of the opening statement, Clare Oaks next contends that the plaintiffs "emphasized their theme of system-wide inadequacy" during the testimony by Pignatiello and Dr. Lachs. With respect to Pignatiello, Clare Oaks' first criticism is that the trial

court erred in overruling an objection to a question asking her what a nurse would have written on a physician telephone order form if in fact Dr. Bigol had discontinued Trendel's Coumadin on March 16, 2011. With reference to an exhibit of a sample physician-order form, she answered that, if it was discontinued as Martinez had testified, it would say, " 'Discontinue all Coumadin per Dr. Bigol.' " We reject the argument by Clare Oaks that this testimony emphasized an improper argument about its system-wide inadequacy, and we find no abuse of discretion in its admission.

¶ 99        Clare Oaks' second criticism of Pignatiello's testimony on this topic pertained to a policy and procedure in existence at Clare Oaks that concerned the information that a nurse should have about a patient at the time the nurse communicates a patient's laboratory results to a physician. Pignatiello was asked what assistance that information would have been to Martinez, if in fact Dr. Bigol had ordered Trendel's Coumadin to be discontinued on March 16, 2011. Pignatiello began answering that, if Dr. Bigol had said to discontinue Coumadin, she would have expected Martinez to respond to him, at which point the attorney for Clare Oaks objected "as to what she would expect." The trial court sustained Clare Oaks' objection. Pignatiello was then asked to proceed with her answer without saying what Dr. Bigol would have said, at which point she answered without objection that she would expect Martinez as a nurse to say, " 'This patient has atrial fibrillation and has been on Coumadin since her admission here, and we've been titrating her dose, she's been on it since she was admitted, why are we discontinuing it[?]' " Clare Oaks did not object again or move to strike this answer. Pignatiello was then asked whether it would end Martinez's responsibilities if Dr. Bigol had insisted on ordering Trendel's Coumadin discontinued. The trial court overruled an objection by Clare Oaks as to what Pignatiello would expect, at which point Pignatiello answered that Martinez would be responsible to write a

physician's order and bring it to a supervisor's attention, as the order would have been an unexpected order for a patient with atrial fibrillation and an INR of 1.38. We again reject the argument by Clare Oaks that this testimony emphasized an improper argument about its system-wide inadequacy. This testimony pertained specifically to Trendel's case, and we find no abuse of discretion in the rulings by the trial court.

¶ 100     Clare Oaks' third criticism of Pignatiello's testimony on this topic arose when she testified that Clare Oaks had a system in place to address the reporting of lab results to a physician, what information a nurse needs to have before reporting them, and what a nurse needs to do after reporting them. She testified that the system was not followed for Trendel, because the "director of nursing did not feel that the system, these policies, needed to be followed and did not educate her nurses to follow them, and Christina Martinez was just not prepared to know what to do because she was not educated properly or supervised properly." No objection was made to this testimony, and thus Clare Oaks has waived any claim of error pertaining to it. *Gausselin*, 260 Ill. App. 3d at 1079.

¶ 101     Clare Oaks further argues that Pignatiello "punctuated her speculation with repeated, inflammatory remarks." Its first example of this is Pignatiello's testimony that Clare Oaks' providing of orientation to Martinez during the night shift was "just plain dangerous," but there was no objection by Clare Oaks to this comment at trial. Its second example was when Pignatiello was asked what her explanation was for why there could be so many errors in Trendel's medication management, and in answering she stated, "It's mind boggling as to how— there were several other errors as well, and it's mind boggling to me as to how many errors should have occurred." However, this answer was cut off by an immediate objection, which the trial court sustained.

¶ 102    In its third example, she was asked what conclusions she had drawn from Trendel's medication administration records, and she answered that there was no evidence that the director of nursing or administrator of Clare Oaks was looking at the medication administration record to ensure that Trendel was receiving care according to physician orders and her known plan of care. She stated in her answer, "I know I shouldn't use the word 'mind boggling' anymore." At that point, the trial court interjected and stated, "You're correct, you shouldn't use it. Refrain from using the term 'mind boggling.' " She then finished her answer by stating that she was "astonished" and had "no explanations as to why these errors were as pervasive as they are and went undetected." There was no objection. Thus, we find that any claim of error is waived. *Id.* We further find that the trial court cured any prejudice to Clare Oaks by interjecting on its own that she should not use the phrase "mind boggling."

¶ 103    As its last example of inflammatory testimony by Pignatiello, Clare Oaks cites testimony that occurred in the context of her discussion of medication errors that she identified in Trendel's chart other than the discontinuation of Coumadin as of March 16, 2011. In her testimony on this topic, she answered "no" to the question of whether it was "just one nurse that was making all these errors." There was no contemporaneous objection to this testimony, but Clare Oaks contends that it was encompassed within a preceding objection that it was beyond the scope of the plaintiffs' Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2007) disclosures of Pignatiello's opinions. On appeal, Clare Oaks makes no argument that this testimony violates Rule 213(f)(3), only that it was inflammatory. Even if we agreed that the objection on the basis of Rule 213(f)(3) encompassed this question, we would find that the objection on this specific ground waived the objection on other grounds, including the inflammatory nature of the remark. *Russo*, 2018 IL App (1st) 180467, ¶ 40.

¶ 104        Clare Oaks argues that Dr. Lachs made additional inflammatory remarks, and it accuses him of "name-calling." It cites three examples, all of which occurred during his cross-examination by Dr. Bigol's attorney. Its examples consist of Dr. Lachs's statement that Coleman, in her deposition testimony, "displayed a general lack of fundamental knowledge about Coumadin." He then stated that Martinez's knowledge of Coumadin was "[e]ven more aberrant" than Coleman's. Finally, when he was asked whether, according to deposition testimony of Martinez that he had reviewed, Martinez was aware on March 16, 2011, of whether Trendel's INR was subtherapeutic, he answered, "She was clueless." No objections were made to any of this testimony, and thus any claim of error arising out of it is waived. *Gausselin*, 260 Ill. App. 3d at 1079.

¶ 105        Finally, Clare Oaks contends that the plaintiffs inappropriately asked witnesses whether Clare Oaks investigated the order that discontinued Coumadin for Trendel, when there was no evidence establishing that the absence of an investigation concerning the discontinuation of Trendel's Coumadin was a breach of the standard of care or was a proximate cause of Trendel's injury. As to the testimony by Dr. Bigol that Hart-Carlson told him that she had investigated and found out that he (Dr. Bigol) had been the one to discontinue Trendel's Coumadin, any error is waived by the failure to object. *Id.* As to the question to Coleman about whether she was aware if any investigation had been conducted to determine why Trendel's Coumadin had not been given on February 27, 2011, this occurred in the context of testimony about chart audits. In context, the question was probative of whether the chart audit process had successfully identified the fact that Trendel's Coumadin had not been given on February 27, consistent with the existing policies and procedures in place at Clare Oaks. We find no abuse of discretion in the trial court's admission of this evidence.

¶ 106                                    E. Limitation on Cross-Examination

¶ 107          Clare Oaks' next argument on appeal is that the trial court abused its discretion by

precluding it from cross-examining the experts for the plaintiff and for Dr. Bigol concerning

their review of Dr. Pop's letter to Dr. Bigol dated March 22, 2011, and of the two nurse

practitioner notes dated March 23 and March 25, 2011, which referred to the discontinuation of

Trendel's Coumadin. Additionally, Clare Oaks argues that the trial court barred it from calling as

witnesses Dr. Pop and Dan Fintel, M.D., an expert disclosed by Dr. Bigol who would have

testified on this topic.

¶ 108          In Dr. Pop's letter of March 22, he stated that he had seen Trendel that day. As part of his

assessment and plan, he noted Trendel's atrial fibrillation and wrote, "off [Coumadin] per Dr.

Bigol. Unsure of reason for discontinuation." During the argument on a motion *in limine* about

the extent to which this letter could be used at trial, the attorney for Clare Oaks informed the trial

court that he wanted to use this letter to argue that Dr. Pop saw Trendel prior to the time of her

stroke, that he was aware then that her Coumadin had been discontinued, and that he could have

taken some action then to reinstate her Coumadin or some other medication to prevent a stroke.

The trial court ruled that Clare Oaks could not use the letter for the purpose of making that

argument, because no expert testimony had been disclosed that criticized the actions of Dr. Pop

or expressed an opinion that he failed to meet the standard of care. The trial court ruled that

Clare Oaks could use the letter for other purposes on cross-examination, such as asking whether

it was something they reviewed and whether it had any effect on their opinions in the case. The

attorney for Clare Oaks then attempted to make use of the letter during the cross-examination of

Dr. Feldmann and of Dr. Lachs, at which point the trial court sustained an objection.

¶ 109          Similarly, the note by the physical medicine and rehabilitation nurse practitioner who saw

Trendel on March 23, 2011, stated, "INR was subtherapeutic [and discontinued] on 3/16/11 [slash] Dr. Bigol." The March 25 note by the nurse practitioner stated that Trendel was "off therapeutic Coumadin." When the attorney for Clare Oaks attempted to use these two notes in his cross-examination of Pignatiello and of Dr. Bigol, the trial court sustained an objection by the plaintiffs' attorney. The trial court stated that it was doing so on the basis that, similar to the concern about Dr. Pop's letter, no expert witness had been disclosed to give testimony that the nurse practitioner should have taken action upon realizing that Trendel's Coumadin had been discontinued. However, counsel was allowed to elicit from Pignatiello on cross-examination that the nurse practitioner had entered these two notes on these dates and that anybody who picked up Trendel's full chart would have access to them. Similar testimony was elicited on cross-examination of Dr. Lachs.

¶ 110    Clare Oaks argues that Dr. Pop's letter and the two nurse practitioner notes were within the scope of appropriate cross-examination of the expert witnesses, as all of them had reviewed these materials in forming their opinions in the case. It argues that it should have been allowed to use these materials for the purpose of presenting evidence to the jury of a third party's causation of Trendel's injury, which would have allowed it to obtain a jury instruction on the sole proximate cause defense.[2] It cites the principle that a defendant need not present evidence that a nonparty was negligent in causing the injury at issue but rather a defendant only needs to present evidence

---

[2]The Illinois pattern jury instruction on the sole proximate cause defense includes the second paragraph of the following instruction:

"More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]" Illinois Pattern Jury Instructions, Civil, No. 12.04 (2011).

that a third party's conduct caused the injury to justify the jury being instructed on this issue. See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 523 (2000). It argues that the trial court's rulings deprived it of relevant cross-examination on a critical issue, based on the trial court's misconception of the law. The scope of cross-examination rests with the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Leonardi*, 168 Ill. 2d at 102.

¶ 111    The sole proximate cause defense "seeks to defeat a plaintiff's claim of negligence by establishing proximate cause in the act of solely another not named in the suit." *Id.* at 92. Our supreme court has repeatedly expressed the rule that a defendant "has the right to endeavor to establish by *competent evidence* that the conduct of a third person, or some other causative factor, is the sole proximate cause of plaintiff's injuries." (Emphasis added.) *Id.* at 101; see also *McDonnell*, 192 Ill. 2d at 521; *Nolan v. Weil-McLain*, 233 Ill. 2d 416, 441 (2009). Though what constitutes "competent evidence" may vary depending on the type of case, in complex cases expert testimony is often necessary to constitute "competent evidence" that the sole proximate cause of a plaintiff's injury is the conduct of a nonparty or some other cause. *Brdar v. Cottrell, Inc.*, 372 Ill. App. 3d 690, 704 (2007). This would be true in medical negligence cases such as this. Although it may not be necessary to show that a nonparty's conduct causing the plaintiff's injury amounted to negligence (*McDonnell*, 192 Ill. 2d at 523), expert testimony on the matter is still necessary before a defendant can argue in closing that a nonparty's conduct was the sole proximate cause of the injury at issue. See *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1036 (2003) (closing argument that is unsupported by facts in evidence is improper).

¶ 112    Furthermore, it is well established that Rule 213(f) requires a party to identify the opinions that the party expects to elicit from an independent or controlled expert witness at trial. Ill. S. Ct.

R. 213(f) (eff. Jan 1, 2018). In turn, Rule 213(g) provides that "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018).

¶ 113    In this case, we find no abuse of discretion by the trial court in the limitation it imposed on the use by Clare Oaks' attorney of Dr. Pop's letter or the nurse practitioner's notes in his cross-examination of expert witnesses for the plaintiffs or Dr. Bigol. Clare Oaks is incorrect to the extent it implies that the trial court completely barred its use of these documents on cross-examination. Rather, the trial court appropriately limited use of these documents on cross-examination as a basis to imply to the jury that either Dr. Pop or the nurse practitioner was the sole proximate cause of Trendel's stroke by failing to take action upon noticing that Trendel's Coumadin had been discontinued, where Clare Oaks had disclosed no expert testimony in its case-in-chief that would support its making of such an argument.

¶ 114    We find this principle to be illustrated by the defendants' disclosures of Dr. Fintel's testimony. Although Dr. Fintel did not ultimately testify at trial, it was disclosed that he would express the opinion that "even if the decedent's Coumadin was restarted on March 22, 2011, it would not have prevented the decedent's stroke." Assuming this is true, it would mean that no conduct on the part of Dr. Pop or the nurse practitioner could have been a proximate cause of Trendel's injury, since both saw her on March 22 or after. If their conduct was not a proximate cause at all, it could not have been the sole proximate cause. Without any expert evidence on this point, the jury could have done nothing but speculate based on the arguments of counsel about whether Dr. Pop or the nurse practitioner was the sole proximate cause of Trendel's injury, which would plainly be improper. Thus, we find no abuse of discretion in the trial court's ruling.

¶ 115    We similarly reject the argument of Clare Oaks that the trial court abused its discretion in

refusing to allow it to call Dr. Pop as a witness at trial. When this issue arose at trial, Clare Oaks' attorney explained that his purpose in calling Dr. Pop was to have him confirm that he did not put Trendel on Coumadin upon seeing her on March 22. We agree with the plaintiff that Clare Oaks' proposed purpose for eliciting this testimony, which was to argue that Dr. Pop was the sole proximate cause of Trendel's injury, would have contradicted its Rule 213(f) disclosure that it expected to elicit the opinion from Dr. Pop that "nothing he/she did or should have done caused harm to the decedent." This disclosure limited the testimony that Dr. Pop could give on direct examination at trial (Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2018)), and the opinion would not have supported the argument Clare Oaks sought to make from it. Further, the plaintiff was entitled to rely on this disclosure in preparing its case for trial. *Fakes v. Eloy*, 2014 IL App (4th) 121100, ¶ 72. Thus, we find no abuse of discretion on the part of the trial court in granting the plaintiffs' motion *in limine* to bar Clare Oaks from calling Dr. Pop at trial.

¶ 116     Finally, we find no abuse of discretion on the part of the trial court in granting the plaintiffs' motion *in limine* to bar the testimony of Dr. Fintel. At trial, the attorney for Clare Oaks agreed that his only purpose for calling Dr. Fintel was to elicit testimony concerning the contents of Dr. Pop's letter. However, there was again no disclosure of any opinion by Dr. Fintel that Dr. Pop's conduct was the sole proximate cause of Trendel's injury. Rather, as we discussed above, his disclosure would appear to indicate that Dr. Pop was not a proximate cause of Trendel's stroke at all.

¶ 117                    F. Failure to Establish Proximate Causation

¶ 118     Clare Oaks' last argument on appeal concerning the evidence at trial is that the jury's verdict was against the manifest weight of the evidence, specifically concerning the evidence of a causal connection between the conduct of Clare Oaks' staff and Trendel's stroke and death.

Therefore, Clare Oaks argues that this court should set aside the jury's verdict and order a new trial. A reviewing court will set aside a jury's verdict only if it is against the manifest weight of the evidence, that is, only where the jury's findings are unreasonable, arbitrary, and not based on the evidence presented or where the opposite conclusion is clearly apparent. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 26.

¶ 119    Clare Oaks argues first that the jury's verdict in this case was "undeniably based on passion and undue sympathy given the inflammatory testimony of plaintiffs' experts." Above we rejected the argument by Clare Oaks that the plaintiffs' expert witnesses gave inflammatory testimony, and thus we reject this argument as a basis for a new trial.

¶ 120    Next, Clare Oaks contends that the jury's rendering of a verdict in favor of Dr. Bigol but against Clare Oaks demonstrates a break in the causal chain between the conduct of Clare Oaks and Trendel's injury. Clare Oaks reasons that, by finding in favor of Dr. Bigol on the plaintiffs' claims against him, the jury must have determined either that he did not order Trendel's Coumadin discontinued or that the plaintiffs presented insufficient evidence he gave this instruction to Martinez. Clare Oaks goes on to reason that, in order to link the allegations that Martinez and Coleman negligently handled the order from Dr. Bigol to discontinue Coumadin, the plaintiffs had to present sufficient evidence that Dr. Bigol gave that order.

¶ 121    We find no merit to this argument by Clare Oaks. There are numerous bases in the evidence that would support the jury's finding in favor of Dr. Bigol but against Clare Oaks. As one example, the jury could have believed Dr. Bigol that he had not ordered Coumadin discontinued but nevertheless found that Martinez had misunderstood what he had said. In this scenario, it could have found that Dr. Bigol complied with the standard of care applicable to him but that Martinez had breached the standard of care by failing to read the order back to him or to

document it as a physician telephone order so that the mistake could be discovered in a timely manner.

¶ 122     Clare Oaks further argues that the evidence linking the discontinuation of Coumadin to Trendel's stroke disproves the plaintiffs' theory that Martinez's charting errors prevented other medical professionals from learning that Trendel's Coumadin had been discontinued. It argues that Coumadin could not have been discontinued if Trendel's health-care providers did not act on that order. Again, we disagree. There was abundant evidence presented that, whether the order was actually given or not, Martinez breached the standard of care by failing to document what she believed to be an order discontinuing Coumadin in the physician's telephone orders section of Trendel's chart. If she had done so, the evidence showed that the error would have been discovered and corrected either during a nightly chart audit or by Dr. Bigol when he signed the telephone order. For all of these reasons, the jury verdict in favor of the plaintiffs and against Clare Oaks was not against the manifest weight of the evidence.

¶ 123                              G. Attorney Fees

¶ 124     Clare Oaks' next argument on appeal is that the trial court erred by granting attorney fees to the plaintiffs in an amount equal to one-third of the gross amount of the verdict, which was the contingent fee that the plaintiffs had contractually agreed to pay their attorneys for legal services performed on the case. Clare Oaks' principal contention on this point is that the trial court erred by awarding attorney fees in the amount of the one-third contingent fee because the plaintiffs failed to provide sufficient evidence that this amount constituted a reasonable fee.

¶ 125     In general, a trial court cannot award attorney fees to a party unless the fees are specifically authorized by a statute or by a contract between the parties. *People ex rel. Schad, Diamond & Shedden, P.C. v. My Pillow, Inc.*, 2017 IL App (1st) 152668, ¶ 101. In this case, section 3-602 of

the Nursing Home Care Act provides that "[t]he licensee shall pay the actual damages and costs and attorney's fees to a facility resident whose rights, as specified in Part 1 of Article II of this Act, are violated." 210 ILCS 45/3-602 (West 2016). Among the rights specified in part 1 of article II is a resident's right to be free from neglect, which the jury found that Clare Oaks had violated with respect to Trendel in this case. *Id.* § 2-107.

¶ 126    In *Berlak v. Villa Scalabrini Home for the Aged, Inc.*, 284 Ill. App. 3d 231, 234 (1996), this court affirmed a trial court's award of $85,000 in attorney fees under section 3-602, even though the verdict obtained by the resident was only $7478.96, less a reduction of 50% for the resident's comparative fault. In doing so, the court explained that the purpose of shifting the prevailing resident's attorney fee to the licensee was "to encourage nursing home residents to seek legal redress against nursing homes for violations of their rights." *Id.* at 236. The court quoted from the supreme court's decision in *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350 (1986), in which the supreme court discussed the purpose of section 3-602, which at that time allowed for treble damages in addition to attorney fees:[3]

> " '[W]ithout the possibility of recovering treble damages and attorney fees, many residents would likely forgo suing a licensee for violations of the Act. The legislature could reasonably assume that residents, either because of their advanced age, mental or physical infirmities or lack of financial resources are often unlikely to pursue costly and time-consuming litigation in the hope of receiving an uncertain or small recovery. *** Moreover, many violations of the Act will yield little in the way of actual monetary damages. *** Providing for the recovery of treble damages has the presumed effect of encouraging

---

[3]Prior to July 21, 1995, section 3-602 of the Nursing Home Care Act stated, "The licensee shall pay 3 times the actual damages, or $500, whichever is greater, and costs and attorney's fees to a facility resident whose rights, as specified in Part 1 of Article II of this Act, are violated." 210 ILCS 45/3-602 (West 1994). It was amended by section 90 of Public Act 89-197. Pub. Act 89-197, § 90 (eff. July 21, 1995).

private enforcement as well as encouraging compliance with the Act.' " *Berlak*, 284 Ill. App. 3d at 236 (quoting *Harris*, 111 Ill. 2d at 369-70).

The court in *Berlak* went on to state that the recovery of attorney fees by a resident who prevails in a private right of action was even more important than the recovery of treble damages for a resident to pursue litigation under the Nursing Home Care Act, as "[w]ithout that recovery, it is unlikely that attorneys would be adequately remunerated for their successful efforts." *Id.*

¶ 127    Citing these policies from *Berlak* and *Harris*, Clare Oaks begins by arguing that they have no application in this case. Clare Oaks states that the verdict in this case of $4,111,477.66 was the largest jury verdict ever in a case brought under the Nursing Home Care Act. They argue that the plaintiffs' attorneys would have had ample incentive to take this case even without a fee-shifting statute. It is not evident from Clare Oaks' brief what its point is with respect to its discussion of the purpose of the statute, as it does not then argue that fee-shifting is inappropriate in this case. To the extent that Clare Oaks is arguing that fee shifting is not appropriate in a case where a nursing home has committed obvious neglect that resulted in significant injury to a resident, we reject such an argument. We adhere in this case to our previous holding that the requirement that a licensee pay the attorney fees of a resident who prevails in an action for the violation of a right under the Nursing Home Care Act is mandatory. *Id.* at 235; see also *Rath v. Carbondale Nursing & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 536, 543 (2007).

¶ 128    As we stated above, Clare Oaks' primary argument is that the trial court erred by awarding attorney fees to the plaintiffs in the amount of their contingent fee. Clare Oaks argues that the proper "starting point" was the "lodestar" approach, in which reasonable fees are calculated by multiplying the number of hours reasonably spent by the attorney on the litigation by a reasonable hourly rate. See *Berlak*, 284 Ill. App. 3d at 242-43. Under this approach, Clare Oaks

contends, the plaintiffs must present the trial court with a properly supported fee petition that specifies what legal services were performed, by whom, the time expended, and the rate charged. See *Young v. Alden Gardens of Waterford, LLC*, 2015 IL App (1st) 131887, ¶ 102. This would include "detailed entries describing services rendered based on records 'maintained during the course of the litigation containing facts and computations upon which the charges are predicated.' " *Id.* ¶ 103 (quoting *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984 (1987)). Clare Oaks argues that the plaintiffs failed to provide the trial court with sufficient evidence to establish that the fees they sought were reasonable. Clare Oaks points out that it was not until the plaintiffs filed their reply brief that they provided estimates of the time their attorneys had spent working on the case over the years of the litigation and that these time estimates were reconstructed well after the work was completed. Clare Oaks contends that, if the trial court had "applied even superficial scrutiny, much less correctly applied the lodestar method, the court would have denied plaintiffs' fee petition or at least significantly reduced plaintiffs' fee award."

¶ 129     In *Berlak*, this court recognized that, while the statute establishes a prevailing nursing home resident's right to fees, it is silent as to the manner in which those fees are to be computed. *Berlak*, 284 Ill. App. 3d at 240. Because the verdict in that case was only $7478.96 reduced by half, the plaintiff employed the lodestar approach in the petition for fees, seeking a reasonable hourly rate for the number of hours actually expended on the litigation. *Id.* at 242-43. The court characterized this approach as " '[t]he most useful starting point for determining the amount of a reasonable fee.' " *Id.* at 243 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). However, while it is true that the lodestar method will be the most useful starting point in many cases, "it is not the only starting point." *Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986).

¶ 130       Nothing prohibits a plaintiff, in seeking fees under a fee-shifting statute, from requesting fees in an amount equal to the contingent fee that the plaintiff has contractually agreed to pay his or her attorney for the attorney's work on the case and establishing that such amount is reasonable. Likewise, nothing prohibits a trial court from awarding statutory attorney fees in an amount equal to that contingent fee, as long as the plaintiff meets the burden of sufficiently establishing that the fees sought are reasonable. See, *e.g.*, *Blankenship v. Dialist International Corp.*, 209 Ill. App. 3d 920, 926-27 (1991); *Dunn v. Illinois Central Gulf R.R. Co.*, 215 Ill. App. 3d 190, 201-02 (1991); see also *Pietrzyk v. Oak Lawn Pavilion, Inc.*, 329 Ill. App. 3d 1043, 1045-46 (2002) (affirming attorney fee equal to one-third of verdict for plaintiff's claim under the Nursing Home Care Act, where parties agreed that one-third contingency fee was a reasonable attorney fee for the case).

¶ 131       In cases where the trial court is assessing a reasonable attorney fee under a fee-shifting statute, "the objective is ' "to award the plaintiff's counsel the market rate for the services reasonably required to produce the victory." ' " *Blankenship*, 209 Ill. App. 3d at 926-27 (quoting *Renken v. Northern Illinois Water Co.*, 191 Ill. App. 3d 744, 751 (1989), quoting *Kirchoff*, 786 F.2d at 328); see also *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶¶ 51-52. Where a contingency fee represents the standard remuneration for the type of case involved, an award in the amount of the contingency fee may be appropriate. *Dunn*, 215 Ill. App. 3d at 202 (citing *Renken*, 191 Ill. App. 3d at 752). However, trial courts " 'are not to rely arbitrarily on a contingency arrangement as the standard for determining a reasonable attorney fee.' " *Dunn*, 215 Ill. App. 3d at 201-02 (quoting *Renken*, 191 Ill. App. 3d at 752). Instead, trial courts are to consider the contractual fee arrangement between the attorney and the client as one factor in their determination of a reasonable fee. *Blankenship*, 209 Ill. App. 3d at 927 (citing

*Renken*, 191 Ill. App. 3d at 752). Other factors for the trial court to consider in determining reasonable attorney fees include the skill and standing of the attorney employed, the nature of the cause, the novelty and difficulty of the questions at issue, the amount and importance of the subject matter, the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the benefits resulting to the client. *Id.*; see also *Pietrzyk*, 329 Ill. App. 3d at 1046. A trial court has broad discretion in awarding attorney fees, and its discretion will not be reversed on appeal absent an abuse of discretion. *Watson v. South Shore Nursing & Rehabilitation Center, LLC*, 2012 IL App (1st) 103730, ¶ 49.

¶ 132    In this case, with an exception discussed below concerning the elements of damages under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2016)), we find that the trial court did not abuse its discretion in awarding attorney fees in an amount equal to the contingent fee that the plaintiffs had contractually agreed to pay their attorneys. As such, the trial court did not abuse its discretion in determining that it did not need to address the lodestar approach or whether the plaintiffs' submissions were sufficient under the lodestar approach.

¶ 133    We do not find this to be a case in which the trial court relied arbitrarily on the contingent-fee agreement, but rather the trial court considered the contingency arrangement among all of the relevant factors in assessing the reasonableness of the fee. It did so after conducting a full evidentiary hearing, at which both the plaintiffs and Clare Oaks put on evidence and made arguments concerning the reasonableness of the fees sought, and Clare Oaks had the opportunity to cross-examine the expert witness proffered by the plaintiffs on the issue. It is evident that the trial court took into consideration the skill and standing of the plaintiffs' attorneys in prosecuting cases involving nursing home neglect, as Clare Oaks stipulated that they were of the highest

competence in the handling and prosecution of such cases.

¶ 134    Additionally, Clare Oaks also stipulated that a contingent fee was the customary remuneration received by attorneys representing plaintiffs in personal injury claims arising out of nursing home neglect in Cook County. Ample testimony was adduced at the evidentiary hearing concerning contingent-fee arrangements. This court further takes judicial notice, and the trial court was no doubt aware, that the General Assembly has by statute provided that "[i]n all medical malpractice actions the total contingent fee for plaintiff's attorney or attorneys shall not exceed 33 1/3% of all sums recovered." 735 ILCS 5/2-1114(a) (West 2016). Thus, it was well within the trial court's discretion to conclude that a fee in the amount of one-third of the verdict for the Nursing Home Care Act claim constituted the " ' "market rate for the services reasonably required to produce the victory" ' " and accordingly to order that Clare Oaks pay this fee to the plaintiffs. *Blankenship*, 209 Ill. App. 3d at 926-27 (quoting *Renken*, 191 Ill. App. 3d at 751, quoting *Kirchoff*, 786 F.2d at 328).

¶ 135    It is further evident to this court that the trial court was fully aware of and considered other factors also in determining a reasonable attorney fee. Prior to the commencement of trial, the trial court was involved in multiple days of settlement discussions with the parties as well as argument concerning approximately 80 motions *in limine* filed by the defendants and an additional 14 motions filed by the plaintiffs. The trial court observed the work by the attorneys at trial and ruled on a lengthy posttrial motion. Having participated in all of this, the trial court was sufficiently familiar with the time and work required on the part of the plaintiffs' attorneys to bring a case such as this to verdict. Thus, we reject the argument by Clare Oaks that the plaintiffs failed to provide the trial court with sufficiently detailed records of the time their attorneys spent and the work they performed on the litigation to support the reasonableness of the fees sought.

¶ 136      Evidence of the time spent by the attorney performing work on the case is one of the relevant factors for a trial court to consider, but the failure of the attorney to keep contemporaneous time records does not negate the reasonableness of the fee award. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 139 (2008); see also *Will v. Northwestern University*, 378 Ill. App. 3d 280, 302-03 (2007) (upholding reasonableness of attorney fee award under contingency agreement despite absence of detailed time records). A trial court is permitted to use its own knowledge and experience to assess the time required to complete particular activities involved in a case. *Kirkpatrick*, 385 Ill. App. 3d at 139. The trial court can also rely on its own observation of the progression of the case and the work involved on the part of the attorneys seeking fees. *Id.*

¶ 137      For similar reasons, we reject Clare Oaks' argument that the trial court erred in denying it discovery concerning the time estimates submitted by the plaintiffs to support their request for fees. Such discovery would not have been relevant in light of the fact that the plaintiffs were not seeking to establish a claim for fees based on the lodestar approach of substantiating the actual number of hours spent on the litigation. We also reject Clare Oaks' argument that the trial court's award of fees should be reversed because the plaintiffs cannot recover fees for pursuing unsuccessful claims against respondents in discovery or against the codefendants of Clare Oaks. Clare Oaks cites nothing that would indicate to this court that the trial court ordered Clare Oaks to pay the plaintiffs' attorney fees for any claims other than the claims against Clare Oaks on which the plaintiffs prevailed. It is evident to us that the award of fees pertained only to the claims against Clare Oaks. Thus, there is no merit to the argument by Clare Oaks that a reduction in the fee award is required because the plaintiffs were unsuccessful in their claims against the codefendants of Clare Oaks.

¶ 138      We do agree with Clare Oaks, however, that the trial court abused its discretion by

including, in its assessment of attorney fees to be paid by Clare Oaks, an amount equal to one-third of the amount of damages assessed by the jury for the elements of damages recovered by Trendel's next of kin under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2016)). As referenced above, the total amount of damages assessed by the jury in this case was $4,111,477.66. Of that total, the jury allocated $250,000 for the loss of society, grief, and sorrow sustained by Trendel's next of kin following her death, which are elements of damages under the Wrongful Death Act. *Id.* § 2. The remaining $3,861,477.66 was allocated to elements of damages suffered by Trendel prior to her death for violations of the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2016)). The trial court awarded fees in the amount of $1,370,492.55, which was one-third of the amount of the total verdict. In doing so, the trial court found that the claim under the Nursing Home Care Act was "inextricably intertwined" with the claim under the Wrongful Death Act.

¶ 139 In *Pietrzyk*, this court addressed a situation where a plaintiff obtained a verdict in which the jury allocated damages both to claims under the Nursing Home Care Act and to claims by next of kin under the Wrongful Death Act. *Pietrzyk*, 329 Ill. App. 3d at 1044. Following the verdict, the trial court determined that, although the plaintiff was entitled to attorney fees in the amount of one-third of the damages for the claim under the Nursing Home Care Act, the plaintiff was not also entitled to fees in the amount of one-third of the damages for wrongful death. *Id.* at 1045. On appeal, the parties agreed that a one-third contingency fee was a reasonable attorney fee for the case, and the question before the court was whether, as a matter of law, the plaintiff was entitled to attorney fees based on the amount of the entire verdict or only on the amount of the damages attributed to claims under the Nursing Home Care Act. *Id.* at 1046. The plaintiff's only argument was that, in a fee-shifting case where there are both claims subject to fees and claims

not subject to fees, a party is entitled to fees on an otherwise uncovered claim "where the two claims 'arise out of a common core of facts and related legal theories.' " *Id.* at 1047. The plaintiff argued that her claims under the Wrongful Death Act required proof of virtually the same elements as her claims under the Nursing Home Care Act and thus the claims were " 'inextricably linked.' " *Id.* at 1047-49. A majority of this court disagreed with the plaintiff's argument.

¶ 140    The majority of the court reasoned that, in a case such as the one before it, there were multiple parties in interest pursuing two distinct causes of action. *Id.* at 1050. One party in interest was the decedent's estate pursuing a cause of action under the Nursing Home Care Act for injuries sustained by the decedent prior to his or her death, as such a claim survived the death of the decedent. *Id.* at 1049-50. The other parties in interest were the decedent's next of kin, pursuing a distinct cause of action for their own damages arising from the decedent's wrongful death. *Id.* at 1050. The court stated that damages for wrongful death were not recoverable under the Nursing Home Care Act. *Id.* (citing *Wills v. De Kalb Area Retirement Center*, 175 Ill. App. 3d 833, 842 (1988)). The majority went on to reason that the "common-core-of-facts" doctrine relied upon by the plaintiff applied to a situation where the same plaintiff pursues multiple causes of action, some of which are subject to fee shifting and some of which are not. *Id.* at 1051. It described the doctrine as a method for a trial court to shift fees "where the time charged in litigating the covered causes of actions was indistinguishable from the time charged in litigating the uncovered causes of actions." *Id.* However, the majority of the court held that the doctrine was inapplicable because "it has not been disputed which parts of the verdict comprise damages for the Nursing Home Care Act claim and which comprise damages for the wrongful death claim." *Id.* The dissenting justice would have found that a common core of facts and

related legal theories existed between the two claims and that therefore the plaintiff should be entitled to fees on the full verdict. *Id.* at 1051-52 (Reid, J., dissenting).

¶ 141    Based on the majority's holding in *Pietrzyk*, we hold that the trial court abused its discretion in granting the plaintiffs' request for attorney fees in an amount equal to one-third of the full verdict, where the basis of the plaintiffs' request was a contingency agreement and the verdict comprised damages for claims under the Nursing Home Care Act and for claims by the next of kin under the Wrongful Death Act. Although we do not disagree with the trial court that the work required to establish the two claims was "inextricably intertwined," we believe that the jury's itemization of damages sufficiently distinguishes the portion of the verdict that is subject to fee shifting on a contingency basis from the portion that is not subject to fee shifting.

¶ 142                                    H. Costs

¶ 143    Clare Oaks' final argument on appeal is that the trial court erred by awarding certain costs to the plaintiffs. The trial court awarded costs to the plaintiffs in the amount of $147,471.55, which included reimbursement for testifying experts' fees, trial exhibits, trial technology and video editing, obtaining medical records, court costs, fees of court reporters and videographers for depositions, fees of court reporters at the trial, production expenses for a day-in-the-life video, and expenses of travel for McFadden's deposition. In doing so, the trial court stated that section 3-602 of the Nursing Home Care Act (210 ILCS 45/3-602 (West 2016)) allowed costs to be shifted that were in addition to the ordinary statutory costs associated with the filing of a lawsuit.

¶ 144    Clare Oaks argues on appeal that the trial court erred in awarding costs in excess of those taxable costs authorized by section 5-108 of the Code of Civil Procedure (735 ILCS 5/5-108 (West 2016)) and the case law interpreting that statute. That statute provides:

"If any person sues in any court of this state in any action for damages personal to the plaintiff, and recovers in such action, then judgment shall be entered in favor of the plaintiff to recover costs against the defendant, to be taxed, and the same shall be recovered and enforced as other judgments for the payment of money, except in the cases hereinafter provided." *Id.*

Clare Oaks argues that the costs recoverable under section 3-602 are the same as the costs recoverable under section 5-108. As stated above, section 3-602 provides that "[t]he licensee shall pay the actual damages and costs and attorney's fees to a facility resident whose rights, as specified in Part 1 of Article II of this Act, are violated." 210 ILCS 45/3-602 (West 2016). This issue presents a question of statutory interpretation, which this court reviews *de novo*. *Sekura v. Krishna Schaumburg Tan, Inc.*, 2018 IL App (1st) 180175, ¶ 46.

¶ 145 In interpreting statutes, the function of the court is to ascertain and give effect to the intent of the legislature. *Harris*, 111 Ill. 2d at 362. The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *Better Government Ass'n v. Illinois High School Ass'n*, 2017 IL 121124, ¶ 22. We view a statute as a whole, construing words and phrases in context to other relevant statutory provisions and not in isolation. *Murphy-Hylton v. Lieberman Management Services, Inc.*, 2016 IL 120394, ¶ 25. Further, courts will avoid a construction of a statute that renders any portion of it meaningless or void. *Harris*, 111 Ill. 2d at 362-63. In ascertaining the intent of the legislature and interpreting the relationship between statutes, the court may consider the reason and necessity for the legislation, the evils it was designed to remedy, and the objects and purposes the General Assembly sought to achieve. *Id.* at 362; *Eads v. Heritage Enterprises, Inc.*, 204 Ill. 2d 92, 103 (2003).

¶ 146 At common law, a losing litigant was not responsible for paying the court costs or expenses

of his prevailing adversary. *Vicencio v. Lincoln-Way Builders, Inc.*, 204 Ill. 2d 295, 299 (2003). However, section 5-108 of the Code of Civil Procedure constitutes a statutory authorization for a prevailing plaintiff to recover costs from a defendant. 735 ILCS 5/5-108 (West 2016). Statutes allowing for the recovery of costs from an opponent in litigation are in derogation of the common law. *Vicencio*, 204 Ill. 2d at 300. Therefore, such statutes must be narrowly construed, and "only those costs specifically designated by statute may be taxed as costs." *Id.*; see also *In re Marriage of Tiballi*, 2014 IL 116319, ¶¶ 24-25.

¶ 147     In *Vicencio*, the supreme court analyzed what "costs" a prevailing plaintiff may recover from a defendant under section 5-108. *Vicencio*, 204 Ill. 2d at 300-02. In doing so, it stated that "the term 'costs' has acquired 'a fixed and technical meaning in the law.' " *Id.* at 301 (quoting *Galowich v. Beech Aircraft Corp.*, 92 Ill. 2d 157, 165 (1982)). " 'Costs are allowances in the nature of incidental damages awarded by law to reimburse the prevailing party, to some extent at least, for the expenses necessarily incurred in the assertion of his rights in court.' " *Id.* (quoting *Galowich*, 92 Ill. 2d at 165-66). The term thus "describes a characteristic shared by all categories of taxable costs ('necessarily incurred'), but it does not prescribe a rule that draws a line between those that must be taxed pursuant to section 5-108 and those that may be taxed pursuant to another statute or rule." *Id.* at 301-02. The supreme court distinguished "court costs, the 'charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees' " from "litigation costs, the 'expenses of litigation, prosecution, or other legal transaction, esp[ecially] those allowed in favor of one party against the other.' " *Id.* at 302 (quoting Black's Law Dictionary 350 (7th ed. 1999)). The court recognized that it was "undisputed that section 5-108 mandates the taxing of costs commonly understood to be 'court costs,' such as filing fees, subpoena fees, and statutory witness fees, to the losing party." *Id.* It held, however, that a

"litigation cost," such as the professional fee charged by a treating physician to give testimony, "may be taxed as a cost only if authorized by another statute or by supreme court rule." *Id.*

¶ 148    Clare Oaks argues that section 3-602 of the Nursing Home Care Act (210 ILCS 45/3-602 (West 2016)) does not define the term "costs" any differently or more broadly than section 5-108. Clare Oaks notes that the last time that the General Assembly amended section 3-602 was 1995. See Pub. Act 89-197, § 90 (eff. July 21, 1995). That was long after the supreme court's pronouncement that the term "costs" had the fixed and technical meaning as allowances to reimburse the prevailing party for "the expenses necessarily incurred in the assertion of his rights in court," as opposed to "the ordinary expenses of litigation." *Galowich*, 92 Ill. 2d at 165-66. However, the General Assembly made no amendment concerning the word "costs" as used in section 3-602. See Pub. Act 89-197, § 90 (eff. July 21, 1995). Based on this, Clare Oaks argues, this court should presume that the General Assembly intended to adopt the supreme court's definition of costs as including only court costs and not litigation costs. Clare Oaks further points out that, in instances when the General Assembly intends a cost-shifting provision to have a broader scope, it has used broader terminology than simply the word "costs." See 735 ILCS 30/10-5-65(a) (West 2016) (court rendering judgment for property owner in inverse condemnation proceedings may award further sums to "reimburse the property owner for the owner's reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees actually incurred by the property owner in those proceedings").

¶ 149    For their part, the plaintiffs argue that we should give a broad interpretation to the word "costs" as used in section 3-602. They point out that, at the time when the General Assembly enacted the cost-shifting provision of section 3-602, it was aware that a prevailing plaintiff had a

statutory right to recover costs. See Ill. Rev. Stat. 1979, ch. 33, ¶ 7.[4] Thus, the plaintiffs argue, if "costs" under section 3-602 is interpreted to mean the same thing as "costs" under section 5-108, that would render redundant the General Assembly's use of the word "costs" in section 3-602. The plaintiffs argue that we must, if possible, avoid an interpretation that would render the term "costs" in section 3-602 superfluous or meaningless. See *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 397 (1994).

¶ 150    The plaintiffs further argue that, in discerning the legislative intent in enacting section 3-602, we should consider that a broad interpretation of the "costs" recoverable under section 3-602 is commensurate with the purpose of the Nursing Home Care Act. As our supreme court has observed, the Nursing Home Care Act was adopted " 'amid concern over reports of 'inadequate, improper and degrading treatment of patients in nursing homes.' " *Eads*, 204 Ill. 2d at 97 (quoting *Harris*, 111 Ill. 2d at 357-58, quoting 81st Ill. Gen. Assem., Senate Proceedings, May 14, 1979, at 184 (statements of Senator Berning)). Among its provisions, the Nursing Home Care Act created a residents' "bill of rights," which guaranteed residents "the right to be free from abuse and neglect by nursing home personnel." *Id.* One means by which the General Assembly sought to ensure that nursing homes complied with the requirements of the Nursing Home Care Act was by expressly granting nursing home residents a private cause of action for damages and other relief against nursing home owners and operators who violate its provisions. *Id.* at 97-98.

---

[4]At the time of the enactment of the Nursing Home Care Act, the statute providing for costs to a prevailing plaintiff stated:

"If any person shall sue in any court of this state in any action, real, personal or mixed, or upon any statute, for any offense or wrong immediately personal to the plaintiff, and shall recover any debt, or damage in such action, then the plaintiff shall have judgment to recover costs against the defendant, to be taxed, and the same shall be recovered, together with the debt or damages, by execution, except in the cases hereinafter mentioned." Ill. Rev. Stat. 1979, ch. 33, ¶ 7.

This statute was later repealed (Pub. Act 82-280, § 19B-101 (eff. July 1, 1982)), at which time a statute with substantially similar language was adopted as section 5-108 of the Code of Civil Procedure. *Id.* § 5-108.

By doing so, the General Assembly embraced the concept of a "private attorney general," realizing that the Department of Public Health could not police every nursing home on a daily basis to detect violations of the Nursing Home Care Act and that the residents themselves were in the best position to know of and seek redress for violations. *Id.* at 98.

¶ 151     When the General Assembly originally enacted the Nursing Home Care Act, it provided in section 3-602 that "[t]he licensee shall pay 3 times the actual damages, or $500, whichever is greater, and costs and attorney's fees to a facility resident whose rights, as specified in Part 1 of Article II of this Act, are violated." Pub. Act 81-223, § 3-602 (eff. Mar. 1, 1980). In construing that version of section 3-602, the supreme court has stated that the legislative purpose behind its enactment was "encouraging private enforcement as well as encouraging compliance with the [Nursing Home Care] Act." *Harris*, 111 Ill. 2d at 370. In elaborating on this purpose, the supreme court stated further:

> "[W]ithout the possibility of recovering treble damages and attorney fees, many residents would likely forgo suing a licensee for violations of the Act. The legislature could reasonably assume that residents, either because of their advanced age, mental or physical infirmities or lack of financial resources are often unlikely to pursue costly and time-consuming litigation in the hope of receiving an uncertain or small recovery. As plaintiff observes, the expected time it would normally take to resolve the case frequently is longer than a resident's life expectancy. A nursing home resident under such circumstances has little incentive to seek redress for violations of the Act. Moreover, many violations of the Act will yield little in the way of actual monetary damages." *Id.* at 369.

In *Berlak*, this court stated that the recovery of attorney fees under section 3-602 was "even more necessary than the recovery of treble damages in order for a resident to pursue litigation under

the Nursing Home Care *** Act." *Berlak*, 284 Ill. App. 3d at 236.

¶ 152    The plaintiffs argue that, in light of the legislative purposes set forth above, it is logical to assume that the General Assembly intended "costs" to be broadly recoverable under section 3-602, because the costs to a plaintiff of prosecuting litigation against nursing homes is often significant, especially when medical evidence is required. They argue that limiting their recovery to those costs already available under section 5-108 would not be consistent with the statute's purpose of encouraging private enforcement and encouraging compliance with the Nursing Home Care Act, especially in cases with a small potential for monetary recovery.

¶ 153    In resolving this issue, our task is to ascertain what "costs" the General Assembly intended for a licensee to pay to a resident who establishes the violation of his or her rights under the Nursing Home Care Act. With respect to the meaning of "costs" as used in section 3-602, we find, as our supreme court did with the use of that term in section 5-108, that "[t]he plain and ordinary meaning of the term *** does not enlighten us." *Vicencio*, 204 Ill. 2d at 301. Although "costs" is a legal term of art, its dictionary definition includes both "court costs, the 'charges or fees taxed by the court, such as filing fees, jury fees, courthouse fees, and reporter fees' " and the broader concept of "litigation costs, the 'expenses of litigation, prosecution, or other legal transaction, esp[ecially] those allowed in favor of one party against the other.' " *Id.* at 302 (quoting Black's Law Dictionary 350 (7th ed. 1999)).

¶ 154    In *Vicencio*, when the supreme court was interpreting the meaning of "costs" as used in section 5-108, it was construing the general statutory provision that allows a plaintiff who prevails in any action for damages personal to the plaintiff to recover costs. The court thus found it "undisputed" that the costs mandated to be taxed against the losing party under that statute included those commonly understood to be "court costs," not "litigation costs." *Id.* The court

recognized, however, that litigation costs may be taxed "if authorized by another statute or by supreme court rule." *Id.*

¶ 155    We agree with the plaintiffs that it can be presumed that, when the General Assembly enacted section 3-602, it was aware that the predecessor statute to section 5-108 already allowed for the taxation of "court costs" to any prevailing plaintiff against any losing defendant. We therefore agree with the plaintiffs that, if we construed the word "costs" in section 3-602 to mean the same thing as "costs" in section 5-108, we would be finding that the legislature's inclusion of this term in section 3-602 afforded a nursing home resident who prevails against a licensee with nothing beyond what was already provided by Illinois law.

¶ 156    Further, in attempting to ascertain legislative intent by looking at the reason and necessity for the legislation, the evils it was designed to remedy, and the objects and purposes the General Assembly sought to achieve, we agree that a broad interpretation of "costs" is more consistent with the recognized purpose of section 3-602 and the other terms that the legislature chose to provide in that statute. As discussed in detail above, the purpose of section 3-602 is to encourage nursing home residents to privately enforce their rights under the Nursing Home Care Act, by reducing the financial disincentives that nursing home residents or their families may have to engaging in litigation to do so. Section 3-602 does this by shifting certain financial burdens of litigation from the residents to the licensees of the nursing homes who violate residents' rights. The expectation is that the prospect of litigation, in which the nursing home will be responsible not just for a prevailing resident's actual damages (which may be modest) but for their attorney fees and costs as well, will have the effect of encouraging nursing homes to comply with the Nursing Home Care Act and decrease future instances where residents' rights are violated.

¶ 157    Further, it is a fundamental rule of statutory construction that we construe statutes as they

were intended to be construed at the time they were passed. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 441 (2008). At the time when the General Assembly first enacted the cost-shifting provision in section 3-602, it also provided not only for the shifting of attorney fees and costs but also for the licensee to "pay 3 times the actual damages, or $500, whichever is greater." Pub. Act 81-223, § 3-602 (eff. Mar. 1, 1980). This indicates to the court that the legislature was concerned that actual damages in cases involving violations of the Nursing Home Care Act would often be too low to eliminate the financial disincentives that residents would otherwise have to engage in the litigation to privately enforce the Nursing Home Care Act that the legislature was seeking to encourage. This in turn leads us to believe that, when the General Assembly provided that a licensee shall pay a resident's "costs," it was using this term in the broader sense of what are commonly understood as "litigation costs." Construing the legislative intent to include only the payment of a resident's "court costs" would do far less to reduce a nursing home resident's financial disincentives to engage in litigation to enforce their rights and to discourage nursing homes from violating the rights of residents. Even though the General Assembly eventually repealed the provisions in section 3-602 for treble damages and a minimum recovery of $500 (see Pub. Act 89-197, § 90 (eff. July 21, 1995)), it did not amend the provision for costs, and nothing about this amendment affects our interpretation of what the General Assembly meant by the term "costs" when it passed the statute. See *O'Casek*, 229 Ill. 2d at 441 (legislative intent that controls is the intent of the legislature that passed the statute, not the intent of the legislature that amends it).

¶ 158     For these reasons, we conclude that the trial court did not abuse its discretion in its award of costs to the plaintiffs.

¶ 159                              III. CONCLUSION

¶ 160    The judgment of the trial court ordering defendant Clare Oaks to pay the plaintiffs' attorney fees is reversed, to the extent that the assessment of attorney fees to be paid by Clare Oaks includes within it an amount equal to one-third of the amount of damages awarded by the jury to Trendel's next of kin for those elements of damages under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2016)). This cause is remanded to the trial court for a redetermination of the attorney fees to be paid by Clare Oaks, consistent with this decision. In all other respects, the judgment of the trial court is affirmed.

¶ 161    Affirmed in part and reversed in part.

¶ 162    Cause remanded.

**No. 1-18-0835**

| | |
|---|---|
| **Cite as:** | *Grauer v. Oaks*, 2019 IL App (1st) 180835 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-L-2472; the Hon. Thomas V. Lyons II, Judge, presiding. |
| **Attorneys for Appellant:** | Karen Kies DeGrand and Meagan P. VanderWeele, of Donohue Brown Mathewson & Smyth LLC, Matthew R. Henderson and Carson R. Griffis, of Hinshaw & Culbertson LLP, and Michael L. Vittori and Michael E. Zidek, of Wilson Elser Moskowitz Edelman & Dicker LLP, all of Chicago, for appellant. |
| **Attorneys for Appellee:** | Michael W. Rathsack, Susan L. Novosad, Steven M. Levin, Margaret P. Battersby Black, and Daniel D. Goldfaden, all of Chicago, for appellees. |